## COMMONWEALTH *versus* JOHN R. BUZZELL.

A minister of the Methodist Episcopal church, who belongs to the "local connexion" and whose duty therefore it is to preach when called upon, to churches within a convenient distance from his residence, is a settled minister, within the meaning of *St.* 1812, *c.* 141, § 2, exempting "settled ministers of the gospel" from serving as jurors.

In determining whether a juror should be put upon the panel to try a cause depending upon the testimony of persons of a particular religious faith, he is not to be asked whether he entertains the opinion that a witness professing that faith is not to be believed on his oath.

On the trial of an indictment for burglary and arson in destroying a Roman Catholic convent, which was burnt down by a great number of persons, it was *held*, that if a juror should think it was not a crime thus to destroy the convent, he would enter tain a prejudice in the cause ; and a juror was therefore asked, whether he had expressed or formed an opinion as to the general guilt or innocence of all concerned in the act.

A juror returned to try an indictment, is not to be asked whether he thinks the crime set forth ought not to be punishable by law, or ought to receive a different punishment from that which the law prescribes.

The decisions made by this Court on the trial of an indictment for a capital crime, are so far final as not to be open to exceptions to be taken as of right. But whether under particular circumstances the Court may not revise a decision so made, *quære.*

The religious faith of a witness is not a subject for argument or proof, for the purpose

Common-
wealth
v.
Buzzell.

of showing that he is entitled to more or less credit than persons of a different religious sect.

If a witness in a capital trial, who has been subpœnaed on the part of the government and examined, absents himself before the trial is finished, and the prisoner has occasion to examine him again, the subpœna may be called for by the prisoner, and a capias may issue to compel the witness's attendance.

Roman Catholics are directed by this Court to be sworn upon the Holy Evangelists, on the ground that those who profess the Catholic faith, generally regard this to be the most solemn form of administering an oath.

Evidence is not admissible to contradict a witness in regard to an immaterial fact, whether such fact come out upon his examination in chief or upon cross-examination.

The *St.* 1830, *c.* 72, mitigating the punishment for burning a dwellinghouse in the night-time in case it shall appear that at the time of the commission of the offence there was no person lawfully within the dwellinghouse, applies to a case where the inmates are compelled by the offender to quit the house before it is set on fire ; the object of the statute being to protect human life.

In the case of a dwellinghouse entered and set on fire in the night-time by a mob, it was *held*, that a stranger, who went in at the same time for the purpose of protecting the persons and property of the inmates, was not a person lawfully within the dwellinghouse, within the meaning of the statute, and consequently that his being in the dwellinghouse when the fire was applied, did not render the arson capital.

An out-building not communicating with the dwellinghouse, (taking the word *dwellinghouse* in a strict sense) is not a part of the dwellinghouse, within the meaning of the statute, and consequently the fact of the inmates being in such out-building at the time when the dwellinghouse is set on fire, does not render the offence capital.

THIS was an indictment for a capital burglary and a capital arson, against John R. Buzzell and eleven others, for breaking and entering and burning the convent of the Ursuline community at Charlestown. The convent was broken into and burnt by a mob, on the night of the 11th of August, 1834.

The case was tried before *Shaw*, Chief Justice, and *Putnam* and *Morton*, Justices.

*Austin*, Attorney-General, and *Huntington*, District Attorney, managed the trial on behalf of the Commonwealth, and *G. F. Farley* and *S. H. Mann*, on behalf of the prisoner.

A person returned to serve as a traverse juror, stated that he was a regularly ordained minister of the Methodist Episcopal church ; that he was not settled over a particular church, but that he belonged to the " local connexion," and consequently it was his duty to officiate whenever called upon to preach to any church of his denomination situated within a convenient distance of his place of residence. The Court held, that he was a settled minister, within the meaning of the

*St.* 1812, *c.* 141, § 2, exempting " settled ministers of the gospel " from serving as jurors.

The *Attorney-General* stated that the prosecution was to be supported in part by the testimony of Roman Catholics, and apprehending that in consequence of there being much excitement in the public mind on the subject of the trial, the persons returned to serve as jurors might not be impartial, he desired that a juror, before he should be sworn upon the panel, might be asked whether he entertained the opinion that a Roman Catholic was not to be believed upon his oath ; for if so, he was not free from prejudice in reference to the cause ; but the Court ruled that the question should not be put.

The Court said, that if the juror should think it was not a crime to destroy the convent in the manner above mentioned, he would entertain a prejudice in the cause ; and the question was asked of the juror, before he was put upon the panel, whether he had expressed or formed an opinion as to the general guilt or innocence of all concerned in the destruction of the convent.

The Court also ruled, that the juror was not to be asked whether, in his opinion, the act set forth in the indictment was of such a character that it ought not to be punishable by law, nor whether he thought the punishment prescribed by the law was unfit for the offence.

The counsel for the prisoner having put to a witness a question which the Court ruled out as irrelevant, the counsel requested the Court to note the point for future consideration ; but the Court said it seemed to be very clear, from the nature of the Court when sitting for a capital trial, (three judges being required to attend,) that exceptions could not be taken to their decisions ; that this point came before the Court at Salem, in 1830, on the trial of Knapp for murder, and was so ruled ; that this consideration might be a good reason for more care in deciding, but that a decision, when once made, was so far final, as not to be open to exceptions to be taken as of right ; that after a capital trial before a full Court, if a motion could be sustained for a new trial, with a view to reverse any legal opinions expressed by the Court, on the trial, it must

Common-
wealth
*v.*
Buzzell.

depend upon the general merits, and the bearing of such opinions upon the decision of the whole cause, and not upon strict technical exceptions.

The Court also ruled, that the religious faith of a witness was not a subject for argument or proof, for the purpose of showing that he was entitled to more or less credit than witnesses of a different religious sect ; and they added, that by our constitution and laws, witnesses of all religious persuasions are placed on the same footing, and each is to stand on his own individual character.

*Farley* said that confession and absolution being parts of the Roman Catholic faith, a witness belonging to that sect might testify what was not true, in the expectation of afterwards obtaining absolution ; more especially in a case like the present, in which a Roman Catholic might be supposed to have a bias ; and he thought that this was a matter for the consideration of the jury, as affecting the credibility of the witness.

But *per Curiam.* We think it is entirely objectionable. You might as well argue upon the effect of any other particular doctrine, for instance, if the witness belongs to a sect which holds that the duration or extent of future punishment will be less than it will be according to the tenets of a different sect, you might argue that his testimony is not entitled to so much confidence as it would be if he belonged to the latter sect. Such course of argument cannot be permitted.

A witness who had been subpœnaed on the part of the government and been examined, happening to be absent when the prisoner's counsel had occasion to ask him a question, the Court said that the subpœna might be called for by the prisoner and a capias might issue, if it should be necessary, to compel the witness to attend. The witness however soon afterwards came into court, and no process against him was ssued.

In the course of the trial, as the witnesses were severally called to be sworn, those who were Roman Catholics were directed to be sworn on the Holy Evangelists. When Bishop Fenwick was called to take the oath, he inquired the reason for this distinction, and objected to it, if this departure from the usual form was intended or could be construed as estab-

lishing an invidious distinction against Catholics. Whereupon t was stated by the Court, that whether the oath be taken in the usual mode, by holding up the hand, or any other, it is in law equally binding, and that false testimony in either case, would equally subject the party guilty to the punishments of perjury. It was also a rule of law, now adopted in practice, that a witness is to be sworn, according to the form which he holds to be the most solemn, and which is sanctified by the usage of the country or of the sect to which he belongs. 1 Starkie on Evid. 82.* It is well understood, as matter of general notoriety, that those who profess the Catholic faith are usually sworn on the Holy Evangelists, and generally regard that as the most solemn form of oath, and for this reason alone that mode is directed in this Court, in case of administering the oath to Catholic witnesses. This is done by the witness placing his hand upon the book, whilst the oath is administered, and kissing it afterwards.

The oath was then administered to Bishop Fenwick in this form.

The Lady Superior of the convent, a witness on the part of the government, testified on cross-examination, (no objection being made to the question put to her,) that the nuns were not accustomed to prostrate themselves to her or to the Bishop. The counsel for the prisoner afterwards put the same question, to a witness called by them, in order to contradict the Superior, but it was objected to by the district attorney, on the ground that a witness is not to be contradicted in regard to matters irrelevant to the issue. The Court observed, that the statement by the Superior was made on cross-examination as to a collateral point, not relevant to the issue, and therefore, according to a clear rule of law, the evidence offered to contradict it was inadmissible ; that the only doubt in their minds arose from the circumstance, that the cross-examination had proceeded without objection, but that as to this it was sufficient to say, that if a party cross-examining asks questions in relation to irrelevant facts, in order to sift the witness, he must take the answers as conclusive ; he cannot afterwards

---

* This is now provided for by the Revised Statutes. Revised Stat. 94, § 8

call other witnesses to disprove them. 1 Phillips on Ev (6th edit.) 258, cites *Spenceley* v. *De Willott*, 7 East, 109, and *Harris* v. *Tippet*, 2 Campb. 637 ; *Odiorne* v. *Winkley*, 2 Gallison, 53.

An exciting cause to the destruction of the convent, was a rumor that one of the nuns was confined there against her will ; and it was testified by witnesses on the part of the government, that she had left the convent in a period of temporary insanity, and had been brought back in that state of mind. The prisoner's counsel offered evidence to prove that she had not been insane, and to this the attorney-general did not object, the fact of insanity having come out on an examination in chief ; but the Court intimated, that the evi· dence offered had no bearing on the case. *Farley*, in answe.' to this suggestion, said that the counsel for the government had produced evidence to show that this institution had been properly conducted and that the public mind had been abused by reports concerning this nun ; and he contended that th» prisoner ought to be allowed to disprove such representation, and to show that the nun was not insane.

*Per Curiam.* The question is, whether the statement of an immaterial fact can be contradicted, if it comes out on the examination of a witness in chief. Now neither party can be allowed to show the internal condition of this institution, by way of excuse, justification, or apology for the attack made upon it ; so upon an indictment for setting fire to a house of ill fame, the bad character of the house is no ground of defence. Then the only object of the prisoner must be, to affect the credibility of the witnesses by contradicting them. But it seems to us that if an immaterial fact is stated by a. witness of his own accord, or as introductory merely to material testimony, or if the party who calls a witness is permitted, without objection, to question him as to immaterial facts, the irrelevant testimony must be regarded in the same manner as if it had come out on cross-examination, and the other party cannot call witnesses to contradict it. Now here the evidence as to the insanity of the nun was immaterial ; it was not objected to by the prisoner's counsel ; the Court were not called to pass upon its admissibility ; and we think

that evidence to contradict it is immaterial, and therefore cannot be received.

By *St.* 1804, *c.* 131, § 1, it is provided, that if any person shall wilfully and maliciously set fire to the dwellinghouse of another, or to any out-building adjoining to such dwellinghouse, or to any other building, and by the kindling of such fire, or by the burning of such other building, such dwellinghouse shall be burnt in the night-time, every such offender shall suffer the punishment of death.   By *St.* 1830, *c.* 72, § 1, it is provided, that whenever any person indicted under the first section of the statute of 1804, shall prove to the satisfaction of the jury, that at the time of the commission of the offence there was no person lawfully within the dwellinghouse which shall have been burnt, and the jury shall so find, the offender, on conviction, instead of the punishment of death, shall be sentenced to solitary confinement for a time not exceeding thirty days, and to hard labor for the residue of his life.

It was testified upon the present trial, that when the mob broke into the convent the nuns and all the other inmates, except the Superior, had left the building, and that she went out of it before it was set on fire.   The evidence however tended to show, that these inmates were compelled to quit the house by the menaces of the incendiaries, that the house was to be burned down.   A question arose whether this mitigating provision of the statute of 1830, should apply to a case where the offenders had themselves compelled the inmates to quit the house, by force or fear, in order that it might be burnt ; and it was contended on the part of the prosecution, that this would be to allow the perpetrators of crime to take advantage of their own wrong, and operate as a fraud upon the law, intended for the security of dwellinghouses and those lawfully inhabiting them.   But the *Court* were of opinion and instructed the jury, that in this respect the literal construction of the statute is the true one ; and that if no person was law fully in the dwellinghouse, at the time the fire was set to it, it was within the mitigating provision of the later statute, although the inmates had been first compelled to abandon it, by force or fear of violence.   It is a question as to the degree of

Commonwealth
*v.*
Buzzell.

crime and punishment. The mitigated offence is still a atrocious crime and subject to a severe penalty, that of con finement to hard labor for life. But it seems to have bee the manifest intent of the legislature to make a broad distinction between this offence, and the setting fire to a dwelling house in the night-time, where the inmates are actually in the house, and in most instances may be presumed to be asleep, by which human life is exposed to immediate destruction. It is designed to hold out a motive to the perpetrators of this atrocious crime, to spare the lives of those, whose dwelling they wickedly intend to destroy. This construction, whilst it conforms to the plain provision of the statute, seems alike conformable to its policy and spirit. If therefore the persons lawfully within the convent, had quitted it before it was set on fire, although induced so to do by force or fear, the arson was not a capital offence.

It was testified by two witnesses, that they were within the convent when it was set on fire, and that they had entered with the mob, for the purpose of protecting the persons and property of the inmates, in case there should be an opportunity ; and the attorney-general contended, that they were persons lawfully in the dwellinghouse, in consequence of which the arson was capital within the statute. But the *Court* were of opinion, and they so instructed the jury, that these witnesses were not lawfully within the dwellinghouse, within the meaning of the statute of 1830 ; that this statute was made to mitigate the previous severity of the law, and was to be construed favorably for the prisoner ; that it was not necessary to consider whether the entry of these witnesses into the convent was lawful, so as to exempt them from liability to an action, but the question was, what was the design of the legislature. The manifest object was to mitigate the punishment where human life was not in danger, that is, where none of the family nor persons placed in the dwellinghouse by them, were in danger ; that those who go in to protect lives or property, in a case of this sort, are not persons whose lives are in danger, within the meaning of the statute, and though their purpose was laudable, the statute was not made to protect them ; and consequently, that the arson was not rendered capital by the presence of these witnesses.

It was testified that some of the nuns, when they went out of the convent, retired to a summer house, which was within the fence by which the convent and the grounds belonging to it were enclosed, but was several rods distant from the convent ; and it was contended by the attorney-general, that the summer house was within the curtilage of the dwellinghouse, and that if any one of the nuns was within the summer house at the time when the convent was set on fire, the arson was capital. *Rex* v. *Clayburn*, Russell & Ryan, 360 ; *Rex* v. *Lithgo*, ibid. 357 ; *Rex* v. *Chalkin*, ibid. 334 ; *St.* 7 & 8 *Geo.* 4, *c.* 29, § 13 ; 1 Hale's P. C. 558, 559 ; 1 Hawk. P. C. *c.* 38, § 25 ; 4 Bl. Com. 225 ; 2 East's P. C. 493, § 10. But the *Court* instructed the jury, that the statute of 1804 was clear on this point, for it provides in another section, (§ 2,) for the case of setting fire to an out-building not within the curtilage of the dwellinghouse, and it was manifest therefore, that in the first section the legislature refer to the dwellinghouse strictly ; and consequently, that the arson would not be capital, although some of the inmates should have been in the summer house at the time of setting fire to the convent.