Commonwealth *v.* Petrillo, Appellant.

Argued January 22, 1941.   Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Thomas D. McBride* and *Harry M. Berkowitz,* for appellant.

*Vincent P. McDevitt,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, March 24, 1941:

This is an appeal by Herman Petrillo from the judgment and sentence of death after his conviction of the murder, on July 20, 1934, of Raffaele Caruso.[1]  A guard

---

[1] This is the same Herman Petrillo who appealed successfully from the judgment and sentence of death after being convicted of the murder of Ferdinand Alfonsi, who died of arsenical poisoning on October 27, 1938.  See *Com. v. Petrillo,* 338 Pa. 65, 12 A. (2d) 317.

in Fairmount Park, Philadelphia, found the latter's body in the Schuylkill River, near the Girard Avenue Bridge, on the morning of July 21, 1934. Caruso was 48 years of age and slightly crippled in one leg. The established cause of death was drowning. To connect criminally this defendant with Caruso's death, the Commonwealth relied on (1) proof of a mercenary motive, (2) the testimony of alleged accomplices, and (3) certain incriminating statements made by him, and by others in his presence.

At the time of Caruso's death there was insurance on his life as follows:

Policy "A," issued November 6, 1933, by the Home Life Insurance Company, for $630, with the insured's landlady, Mrs. Christine Cerrone, named as beneficiary.[2]

Policy "B," issued December 11, 1933, by the Metropolitan Life Insurance Company, for $420, with Mrs. Cerrone named as beneficiary.

Policy "C," issued February 21, 1934, by the John Hancock Mutual Life Insurance Company, for $400 with "the estate" named as beneficiary. On May 24, 1934, the beneficiary was changed from "the estate" to "Herman Caruso, relation—brother," (meaning this defendant who posed as Herman Caruso; he was in fact no relation of the insured). The state charges that the name "Raffaele Caruso" had been signed by this defendant to the application for change of beneficiary.

Policy "D," issued February 28, 1934, by the John Hancock Mutual Life Insurance Company, for $640, with the defendant named as beneficiary, again under the alias of "Herman Caruso." Policies "B," "C," and "D" provided for "double indemnity" in case of accidental death.

---

[2] Mrs. Cerrone (now about 71 years of age) pleaded guilty in December, 1939, to being an accomplice in this homicide, but at Petrillo's trial she asserted on the witness stand: "They had me plead guilty, but I am not guilty. I didn't do anything."

Agent Cirillo of the Metropolitan Life Insurance Company testified that on January 2, 1934, the defendant applied to that company for a $3,000 policy on the life of Raffaele Caruso, describing himself as Caruso's "nephew" and agreeing to pay the premiums. The application was rejected. H. B. Forjohn, agent of the John Hancock Mutual Life Insurance Company, testified that Petrillo was the payer of the premiums on policy "C" (written by this agent) and that in June, 1934, he called on Petrillo and informed him that the two policies ("C" and "D") "were in excess of the tabular limits allowed by the company" and that policy "C" (in Petrillo's possession) would have to be returned and that he would refund him the premiums. (Agent Bove had written policy "D.") Petrillo replied: "Well, what are you all worried about?" Forjohn directed Petrillo to have the agent in Petrillo's territory transfer the policy to Forjohn's territory so that he could cancel it. Petrillo agreed to do this. When the agent returned from his summer vacation he found that the policy had not been transferred and cancelled and that the insured had died. The agent then requested Petrillo *not* to present a claim on Policy "C" and gave him $20. Petrillo then agreed to present a claim only on Policy "D."

After Caruso's drowning, the defendant (so it is testified) became very active in collecting on these policies. He reported to the agent of the Home Life Insurance Company that Caruso had "died accidentally." When the check for $600.00 was ready on policy "A" (why the amount was not $630.00 does not appear), the defendant and Mrs. Cerrone and the undertaker, A. J. Errichetti, came to the agent's office and Petrillo said: "Give me the money and I will pay the undertaker." The agent testified that after Mrs. Cerrone cashed the check at the bank, Petrillo took the money out of her hands. He gave the agent $50.00 for a policy on Mrs. Cerrone's life. What Petrillo did with the balance of the money does not appear.

D. Benjamin Kresch, a lawyer, testified: "Petrillo came to my office and told me that he had a friend who was having difficulty collecting on an insurance policy, that they were trying to collect double indemnity on it, and were only able to get single indemnity from the company, which involved a policy ["B"] with the Metropolitan Life Insurance Company. I asked who the person was. He said, 'Mrs. Christine Cerrone.'" The attorney testified that he got in touch with that insurance company on several occasions and "finally the Metropolitan agreed to pay the sum of $420.00 in settlement." The witness said he told defendant about this offer and the latter "said he would talk to Mrs. Cerrone and let me know, and he returned in a short time and said that the amount was agreeable. . . . I communicated with the insurance company and received a check from them payable to Mrs. Cerrone." The witness said he cashed the check at the Pennsylvania Company, that he gave the cash to "Mrs. Cerrone, and as I remember, she handed some of the money to Petrillo. She said to me she owed him some money."

E. B. Lyman, a home office representative of the John Hancock Mutual Life Insurance Company, testified that when the claim for insurance on Caruso was presented to his company he tried about fifteen or twenty times to meet defendant and finally met him. The latter first represented himself to the witness as "Herman Caruso." The witness said to defendant: "If you are Herman Caruso, why did you sign our change of beneficiary form as Raffaele Caruso, making yourself brother and beneficiary?" Defendant said that the agent made him do that. The witness said: "What agent made you go into our branch office at 7th and Chestnut and forge the name of Caruso to the claim certificate?" Defendant did not answer. The witness stated the defendant claimed $2,080.00 "because the man was accidentally drowned." Petrillo, the witness testified, "wanted the one policy that Mr. Bove wrote paid with the double

indemnity, and then he propositioned that they pay both of them without double indemnity. Then he propositioned that he would be willing to accept the one that Forjohn wrote with double indemnity. In other words, I think one was $640.00 and the other was $400.00 even." When the witness told defendant that "the company would have a public administrator appointed, he [the defendant] pulled out an administration paper out of his pocket, a blank, and said that he was going to be made administrator."

F. V. Jones, District Cashier for the John Hancock Mutual Life Insurance Company, testified that Petrillo presented a death certificate to him, made an affidavit to it and demanded payment. When the witness asked him by what right he made his claim, "He said he was a brother, beneficiary in the policy" and had "paid the premiums always." This witness identified a check of that insurance company for $445.00 "to the order of Antonio J. Errichetti" (undertaker) and stated that this check was issued in pursuance of Petrillo's claim. He said that it was "a partial settlement of two policies" (i. e., policies "C" and "D"). Petrillo signed the release, both as "Herman Caruso" and as "Herman Petrillo." Later in his testimony the witness said that the release referred to was "in full consideration of both policies." The Commonwealth called as a witness the undertaker's son-in-law, who assisted him. He testified that Petrillo got this $445.00, gave the undertaker $250.00, gave the witness $20.00 for flowers and "kept the change." (Errichetti died in 1936.)

S. F. Herron, Assistant District Manager of the John Hancock Mutual Life Insurance Company, testified that after Caruso's death the defendant, in reply to a question, said: "I gave the agent the name Herman Caruso because I knew he would not issue the policy unless there was a relative or some beneficial interest in the policy." Petrillo admitted to an agent that he had

signed the name "Raffaele Caruso" to the application for change of beneficiary of policy "C." Agent Lowa testified that the defendant paid the premiums on policies "C" and "D" and that he represented himself as "[Herman] Caruso."

This record discloses that this defendant and Caruso met for the first time in the Jewish Hospital, Philadelphia, in June, 1933, when according to Morris Bolber, the defendant took him to that hospital, saying he "would show him a man who did miracles." Caruso was then in this hospital recovering from an injury received in an automobile accident. Defendant introduced Bolber to "a cripple sitting in a chair," as Caruso, and when the latter did not reply to Bolber's question (in English) about his condition, Petrillo said: "Don't worry about him, I am going to make plenty of money on this man."

A few weeks later, according to the testimony of Mrs. Christine Cerrone, Petrillo made arrangements to bring Caruso to her home at 1305 Porter St., Philadelphia. He told her that he wanted her to give him plenty of good attention, as he (Caruso) was about to be operated on for hernia. A week later defendant brought Caruso to her home. She said Petrillo gave her each week, $6.00 for Caruso's board and $1.00 to pay Caruso's insurance premiums. Caruso resided at her house from September 1933 to the time of his death. The last time she saw him was 4 p. m. the day before his body was found. She testified: "He was then going out fishing again" and that "he went fishing every day."

Salvatore S. Sortino[3] (an accomplice) testified that Morris Bolber introduced him to defendant. One morning in 1934 he and Bolber and the defendant met at Bolber's and after the two later conferred inside five

---

[3] Salvatore S. Sortino was later indicted for the murder of Caruso and pleaded guilty. After he was adjudged guilty of murder in the first degree, he was sentenced to life imprisonment,

or ten minutes, they came out and Petrillo said to the witness: "How would you like to go fishing?" The witness said that defendant made the arrangements that "we should go to League Island after supper and he will have a man with him in the car." They met as planned and "the Italian man in the car turned around" and said: 'There is no fishes here.' Petrillo then told Sortino to go home. The next morning Petrillo said to the witness: 'Would you want to go fishing this afternoon or evening?' He made the arrangements that this witness should go to the West River bridge, stay near the bridge—and find his car. They met at the point indicated on July 20, 1934. Caruso was on the bank of the Schuylkill River fishing. Defendant came to Sortino, put his left hand on top of his right shoulder and said: 'I want you to give that man [Caruso] a push.' "
Sortino testified further: "Beings that it was Herman Petrillo had done me a favor and lent me $10 to pay my rent a few weeks ahead of time, I didn't know what to do. I got like a shock and I started shaking, and after I start shaking, I made up my mind, I don't know whether the man would turn around and want to kill me with the other one. So I figured that I would go to it, which he followed me in the back, and I would give the man a push to push him on the ground and I would start to run. . . . I went around behind the man, I pushed the man on his left shoulder and pushed right on the ground and when he was on the ground, I started to run. . . . When I looked backward, I saw Herman Petrillo pushing the man in the water. So I got more scared and start to run. I went direct to Morris Bolber and told him the exact thing what had happened." It was testified by another witness that the water in the river was at that place and time about ten feet deep. Sortino testified that three or four months later the defendant gave him $75.00, telling him "that was for the job done," and "I advise you to keep quiet if you want to eat bread."

Morris Bolber[4] testified that when he and the defend-ant were together in the District Attorney's office, Pe-trillo wanted to know "if Sam [Sortino] told me anything and I said 'yes' and Petrillo said: 'I did not know you knew about it' and I told him I knew the whole story, that Sortino came to my home about 10 or 11 o'clock on July 20, 1934, and said that he and Herman Petrillo took a cripple man from 1305 Porter Street, to Girard Avenue Bridge and gave him the cold bath." He added: "Petrillo said 'everything is true.' . . . I heard Chief Connelly tell him: 'Did you kill Raffaele Caruso?' " and the defendant answered: " 'Don't call this [a] killing, call this a job.' "

W. J. Connelly, Chief of the County Detectives, tes-tified that he handed to defendant, Bolber's statement that "Sortino came down to my home some time after [the drowning] and gave me $20." Bolber asked Sortino where he got the money and he told him he got it from Herman after the drowning of Caruso. Chief Connelly said to Petrillo: "Herman, did you commit that mur-der?" and he answered: "Don't call it murder, call it a job."

Police Captain James A. Kelly testified that when he called the defendant's attention to Sortino's written statements saying that Sortino and Petrillo did the job (of killing Caruso) together and said to the defendant: "What have you got to say about that?" the defendant replied: "What else is there to say, that is all."

The defendant explained his possession of policies on the life of Caruso as follows: "When I was a bartender, agents Bove and Forjohn came to me and said: 'We

---

[4] While on the witness stand Bolber claimed that the notation on a bill of indictment charging him with the murder of Caruso and showing the entry on December 29, 1939, of a "plea of guilty" was an error. He said he pleaded guilty only to an indictment charging him with the murder of Roman Mandiuk. He added: "I got nothing to do with this case [the murder of Caruso] what-ever." (Mandiuk was poisoned.)

got a present for you.' He pulled out the policy with the name Ralph Caruso, . . . beneficiary: Herman Caruso. I says, 'You made a mistake. My name is not Herman Caruso.' . . . Bove said: 'What the hell is the difference? This ain't going to cost you anything. I was looking to solicit business, so I go to 1305 Porter Street and I get Ralph Caruso to take this policy.'" Petrillo testified that while he first "refused to take this policy," he got it "two weeks before Ralph Caruso met his death." He claimed that the insurance premiums he paid each week was with money "given to [him] by Mr. Bove every month." He testified that when he went to Undertaker Errichetti to make arrangements for the funeral the latter told him "to put the claim in." He said to the undertaker: "The name over here, that's not right. You know my name is Petrillo, and here it is Caruso." The undertaker said: "'Who made you do that?' I said, 'Forjohn and Bove. They came around and hand me their policy. I don't pay a nickel on the premium.'" The undertaker said: "Well, go over there and sign it just the way it is here." He testified that when Mr. Lyman, office representative of the John Hancock Mutual Life Insurance Company, asked him if his name was Herman Caruso, he answered that his name was Herman Petrillo. Lyman said: "Well, over here they got Herman Caruso." Defendant said: "Well, ask the agents, Bove and Forjohn, don't ask me." The undertaker then took him a lawyer named Fuiman, who said: "You're going to collect every cent." Defendant testified that he replied: "I don't want to have nothing to do with it. I have never been in trouble before." The undertaker said: "Well, you are responsible for the funeral. You had better stick and the company got to pay you." Defendant said: "You going to put me in an awful pickle position." Petrillo testified that when Mr. Lyman later offered to settle the claim by paying the funeral expenses, he said: "That's all I want."

Defendant denied receiving any part of the proceeds of the insurance policies, denied saying in the Jewish Hospital to Bolber that he "was going to make plenty of money on" Caruso, and denied any part in any plot to drown Caruso. He said he knew nothing of Caruso's death until Mrs. Cerrone informed him of it three days after the event. He claimed that after Caruso's death agents Bove and Forjohn demanded policies "C" and "D," "so that they would not lose their jobs," and promised him $50 for them. He asserted that he gave policy "D" to the undertaker when Mrs. Cerrone asked him to look after the funeral. He explained his activities in collecting policy "B" for Mrs. Cerrone by saying that he "happened to be in her neighborhood and she was sitting on her steps" and she informed him that she had to her surprise found this policy in her house and "wished he would take care of it." He took the policy to Attorney Kresch, who settled for $420. Defendant said he got none of the money, though he was promised a present from Mrs. Cerrone, which he never got. He denied "confessing" to Chief Connelly or to anyone else.[5]

The defendant denied applying for a $3,000 policy on Caruso. He declared that the premiums he paid on policies "C" and "D" were with money supplied him by agent Bove (who is now in a sanatorium). He asserted that when he found that in policy "C" he was named as "brother" of Raffaele Caruso, he told the agent he was not Caruso's brother. He denied claiming to be

---

[5] His testimony at this point is as follows: After Bolber was arrested Chief Connelly told him that Bolber was ."squealing on everyone." Defendant replied: " 'That's a shame. He is even squealing on his own best friend.' He says: 'Who is this?' I says, 'Sortino.' . . . Chief Connelly said, 'He [Sortino] is accusing you, too.' I said, 'For what?' He says, 'He said that you was with him when he pushed Caruso in the Schuylkill River, and you helped him.' I says, 'He is a God-damn liar, Chief.' " He testified that some time later he said to the Chief: "You must believe me. I am the victim of a frame-up."

Caruso's brother in the application for policy "D," or anywhere else. He said he signed his name "Herman Caruso" on the claim for insurance because a girl in the insurance company's office told him he "had to do that" (the beneficiary being "Herman Caruso"). He denied paying Sortino money for pushing Caruso into the river or that he ever said to Chief Connelly: "This was no killing. This was a job."

He testified that when he asked Sortino why he (Sortino) had squealed on him, Sortino replied that the detective said he (Petrillo) had squealed on him. Petrillo replied: "How could I squeal on you if I don't know anything about you? Morris Bolber squealed on you." Sortino then said: "If that is the case, I am going to tell the truth. He [Bolber] got $200.00 from a lady and he gave me $100.00 to take Caruso fishing."

When the defendant was shown the signature "Herman Caruso" on the application for insurance on Raffaele Caruso and on the claim made for insurance after Caruso's death and asked if such signatures were his, he replied: "I don't know." When asked as to making the affidavit supporting his claim for insurance, he answered: "I don't remember." He admitted that he "expected [as proceeds of policies "C" and "D"] something around $2,000." As to Attorney Kresch's statement that Mrs. Cerrone give defendant money from the insurance proceeds, saying she owed him some money, defendant declared: "That is not right."

Cesare Valenti,[6] called by the defendant, testified that Sortino told him before the Petrillo trial that he, Sortino, was going to testify against Petrillo because the latter only paid him $10.00 on a bill for $35.00 for repairing his automobile. An official court stenographer testified that Sortino when first arrested said that the drowning of Caruso took place between six and seven

---

[6] Valenti pleaded guilty to the murder of Charles Favato and was sentenced to life imprisonment.

o'clock in the evening, and that he then told conflicting stories about Caruso's death, one story being that Caruso had fallen while casting a fishing line, and the other being that Petrillo had pushed Caruso into the river. Park Guard McClain testified that the East River Drive in Fairmount Park (near which drive the drowning of Caruso took place) is well travelled between six and seven o'clock at night and the Girard Avenue Bridge is also well travelled at that hour. Four boys testified in substance that at about 10 : 30 p. m. (Daylight Time) on July 20, 1934, they were out on the West River Drive and that when near the spot where Caruso was drowned, they heard a faint splash in the water and loud cries. A man came running toward them and said: "Did you hear that?" They replied: "Yes, what is it?" These boys called the park guard's attention to what they had heard. The park guard took them down to the bank but "they couldn't see a thing, except a faint haze over the river and it was dark underneath the bridge." The purpose of this evidence was to contradict Sortino who had testified for the Commonwealth that the drowning of Caruso took place between 7 and 8 p. m. (Daylight Time) on that date. There was no proof as to who made the outcries the boys claim they heard on the night in question. When Park Guard Eckes at about 10 : 45 p. m. (D. T.) responded to the call of the boys he got a life preserver and a grappling hook and had automobile spotlights shown on the bank and underneath the bridge but he was unable to see anything.

The Commonwealth made out against the defendant the essentials of a case of first degree murder and the verdict of guilty and the sentence of death fixed were both well supported in the proof. The remaining question is: Were the fundamentals of a fair trial substantially breached in any way? Appellant claims that they were and he has filed twenty-three assignments of error.

The 9th, 10th, 12th and 14th assignments are based on the admission in evidence of a statement alleged to have been signed by the defendant on April 28, 1939. The substance of the statement was that since 1935 he gave "at least four ounce bottles of furtuna to Cesare Valenti and three or four ounce bottles to Mrs. Carina Favato" and that he was paid by Cesare an average of $300.00 for each bottle (which he divided with two others) and was paid $300.00 a bottle for two of the four bottles he gave Mrs. Favato (this was divided also). "This medicine," he said, "was a germ which, if enough was given to a human being, would cause their death." He said in the statement that Dr. D'Alonzo told him that "one teaspoonful [of furtuna] in water, coffee, wine or any liquid, about three times a day, and the party to whom it would be given would die within two weeks to one month. . . . Last June in 1938 he gave me typhoid germs. I got them for Bolber."

After this statement was read in evidence, the trial judge said to the jury: "The court's ruling permitting this statement . . . to be read in your hearing, was based upon the fact that the statement might tend to affect the credibility of Petrillo as a witness. . . . [It] might have a material bearing upon your decision as to whether or not he is to be believed as a witness. You are not to consider anything in the statement as evidence of the defendant's guilt. . . . There is another phase of the case upon which you may consider the contents of that document. . . . That is, if and when you come to consider the question of punishment in this case. . . . Where a jury finds the defendant guilty of 'first degree murder' the jury must decide the punishment . . . whether or not it is to be death in the electric chair or life imprisonment. When you come, if you do, in this case to consider that question of punishment, it is the rule of law in Pennsylvania that the jury is entitled to have before it such evidence as this."

This evidence was thus admitted for two purposes: for *one* purpose it was *in*admissible; for the *other* purpose it *was* admissible. "When an evidentiary fact" is admissible for one purpose. "it is not inadmissible because it does not satisfy the rules applicable to it in some other capacity and because the jury might improperly consider it in the latter capacity": Wigmore on Evidence, 3rd ed., Vol. 1, page 300, sec. 13.

The evidence challenged was *not* admissible *to affect the defendant's credibility.* The District Attorney offered it ostensibly as *rebuttal* of the last seven words of the statement made by the defendant who when asked by his own counsel: "Did you ever confess to Chief Connelly or anybody at all that you ever participated in any charge on which you are now being charged' [i. e., tried]?", answered: " Not this one *and not on any one of them.*" (Italics supplied.)

There seems to be considerable misunderstanding of the rules of evidence relating to the *contradiction of witnesses.* No witness can be contradicted *on everything he testifies to* in order to "test his credibility." The pivotal issues in a trial cannot be "side-tracked" for the determination of whether or not a witness lied in making a statement about something *which has no relationship to the case on trial.* The purpose of trials is not to determine the ratings of witnesses for general veracity. A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this: "No contradiction shall be permitted on collateral matters." Judge PARKER speaking for the Superior Court in *Berliner v. Schoenberg,* 117 Pa. Superior Ct. 254, 258, 178 A. 330, said: "If it be conceded that the evidence offered was irrelevant, it was improper to attempt to impeach the plaintiff's veracity by the use of it." (Citing Greenleaf on Evidence & Pennsylvania appellate court cases.) See also *Hildeburn et al. v. Curran,* 65 Pa. 59. This col-

lateral (or immaterial.) matter cannot be contradicted whether it was brought out on cross-examination or whether it was "volunteered" by the witness either on direct or cross-examination: Wigmore on Evidence, 3rd ed., Vol. 3, page 672, sec. 1007.

Wigmore (supra) says in section 1003. "The only true test [of "collateralness"] is that laid down in *Attorney-General v. Hitchcock*, 1 Exch. 99 Pellock, C. B. 'Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?' " In applying this test, it is obvious that there are two different groups of facts of which evidence could have been admissible independently of the contradiction: (1) facts relevant to some issue in the case, and (2) facts relevant to the discrediting of a witness. In the latter class Wigmore includes "facts discrediting the witness in respect to bias,[7] corruption,[7] skill,[7] knowledge,[7] etc."[7] (Sec. 1005).

---

[7] Under *"bias,"* if a witness for a party should be asked if he did not sustain a certain relationship to the party in whose behalf he testified, such as, e. g., son or brother and if he denied it, he could be contradicted. Under "corruption," contradiction is permissible upon facts tending to show the witness's corrupt testimonial intent *for the case* in hand, as, e. g., a corrupt agreement between the witness and a litigant in the case and relating to the case on trial or that a witness had attempted to influence other witnesses in the case. As to *skill*, "circumstances diminishing the witness's qualifications, may perhaps be proved. . . . The trial court should have discretion." As to intoxication and illness: "The facts of intoxication and of illness, at the time of the events observed or of giving testimony, are admissible. to discredit the witness's testimonal powers." As to opportunity of observing the events: "A necessary qualification in a witness is personal knowledge, i. e., an opportunity, as to place, time, proximity, and the like, to observe the event or act in question, and the deficiency of such opportunity may be shown to discredit" the witness. As to recollection: "When the memory is tested by asking for the witness's recollection of facts not otherwise material, his errors of recollection cannot be shown by extrinsic testimony. But circumstances which form the alleged grounds of his recollection of material facts testified to by him should be subject to contradiction."

The facts relevant to the discrediting of a witness must have grown out of the witness's relationship to the case on trial or to those individuals involved in it or they must refer to the witness's testimonial infirmity or inability *in respect to that case.* For example, if a witness's testimony was based to any material degree on his pretended familiarity with a certain foreign language, it could be shown that his pretensions were unfounded. If a witness based his testimony on what he claimed he saw by moonlight or electric light, it could be shown by way of contradiction that there was no light at the time and place in question. Particular facts cannot, as a rule,[8] be given in evidence to impeach a witness's general credit, but facts which *immediately* affect the quality of the witness's testimony in the case trying *are* admissible.

The Commonwealth cites the case of *Commonwealth v. Duca*, 312 Pa. 101, 108, 165 A. 825, as authority for the "contradiction" permitted in the instant case. The contradiction permitted there was to a witness's denial that she had been interviewed by anyone concerning *the very crime as to which she was then testifying.* The Commonwealth also cited *Batdorff v. The Farmers Nat. Bk. of Reading,* 61 Pa. 179. The contradiction permitted there was "to show a state of facts from which a jury might . . . infer bias . . . against the defendant, and therefore to affect his credit." In *Griffith v. Eshelman,* 4 Watts 51, this court condemned the practice of permitting contradiction on matters foreign to the issue

---

As to narration: "Circumstances affecting the witness's ability to narrate his story intelligently and correctly are material to his credit, and should be subject to contradiction." (All quotations in this footnote are from Wigmore on Evidence, 3rd ed., Vol. 3, sec. 1005.)

See also *Beck v. Hood,* 185 Pa. 32, 38, 39 A. 842, and *Com. v. Wiswesser,* 124 Pa. Superior Ct. 251, 261-2-3, 188 A. 604.

[8] Judgments of conviction of crimes similar to the crime charged are admissible to impeach a witness's credibility. See *Com. v. John Doe, alias Ross,* 79 Pa. Superior Ct. 162.

trying, saying that such practice "renders the trial of a cause interminable" and "the jury may be readily and greatly misled by it and induced to give a verdict fraught with the highest degree of injustice." In *Commonwealth v. Wilson*, 186 Pa. 1, 40 A. 283, this court held that statements made by a defendant in regard to crimes other than that under investigation were not admissible in evidence for any purpose. The court said: "They [defendant's statements] served to blacken his character, to arouse indignation against him in the minds of the jurors and to show him to be a monstrous criminal who was capable of any crime in the calendar; but they throw no light on the question the jury had to determine. . . . Upon a trial for a specific crime, the evidence should bear some relation to the question of the defendant's connection with the particular crime charged." To the same effect is *Com. v. Jones*, 280 Pa. 368, 124 A. 486. See also *People v. Greenwall*, 108 N. Y. 296, 15 N. E. 404, where the Court of Appeals of New York reversed a conviction of murder because of the admission of evidence to contradict the defendant's statement on the stand that he had not committed a certain burglary (unrelated to the homicide). The Court of Appeals held that it was error to permit contradiction of the defendant, on this collateral matter, an independent crime. In *Com. v. Buzzell*, 33 Mass. 153, the Supreme Judicial Court of Massachusetts held that evidence is not admissible to contradict a witness in regard to an immaterial fact, whether such fact came out upon his examination in chief or upon cross-examination. See also *Com. v. Garanchoskie*, 251 Pa. 247, 252, 96 A. 513. In *Com. v. Payne*, 205 Pa. 101, 104, 54 A. 489, this court, speaking through Justice MITCHELL, said: "The truthfulness of the witness's testimony . . . might be attacked by direct contradiction, or by showing a special animus or prejudice on the part of the witness . . ., or by showing a bad reputation for truth and veracity in general. But this is the extent."

In *Com. v. Quaranta*, 295 Pa. 264, 272, 145 A. 89, we held: "Conduct derogatory to the witness's character for veracity may be proved by showing that he has been convicted of an infamous offense. No collateral issue of fact is thus raised, as the record establishes the fact. But every offense of crime under the law is not relevant to prove one's character for veracity, and, as it is not permissible to show a general bad character because of the abuse that could be made of it by the prosecution." (Citing cases.)

"Neither the necessity of avoiding collateral issues, nor the injustice of attacking a witness unprepared to defend himself, requires the exclusion of proof of a witness' conviction of crime to impeach him, the first being minimized by the directness and certainty of proof obtainable, and the second because preparedness would be almost useless in meeting such a fact": 7 Encyclopedia of Evidence, page 216.

The 12th, 13th and 14th assignments of error are based on the admission of a statement signed by the appellant as a witness on April 30, 1939. This statement was made by Cesare Valenti in the District Attorney's office in the presence of the defendant, Chief Connelly, and Ralph Polselli. In this statement Valenti said he came to Philadelphia in 1935 at the request of Polselli and with money furnished by him. When he reached Philadelphia he went to the home of Mrs. Favato, who told him that her husband, Charles, was upstairs asleep. She said: "Ralph, we got job for you, we want to get rid of Charley Favato." She suggested a method of killing her husband and Valenti said: "This is no job for me." Valenti went to see Herman Petrillo and told him about this proposition. "Petrillo told me to come back in a couple of days. When I came back Herman gave me a bottle of miracle water. I go over to Mrs. Favato's home and gave the bottle to Mrs. Favato. Polselli upstairs, he came downstairs and gives me $150.00. He says to them: 'This is the guar-

anteed stuff from Washington, D. C., and will do the job.' I take the $150.00 back to Herman Petrillo and go back to New York. I come back two days later to Mrs. Favato's home and Ralph [Polselli] give me one hundred and fifty dollars more, this money I keep it was for me." He was asked: "When you came back for your $150.00 was Charley Favato dead?" He answered: "No, he was sick in bed, he died about one week later."

Defendant's failure to deny the charge Valenti made against him in the April 30th statement would make it admissible in evidence against him if it was material. This court said in *Ettinger v. Com.*, 98 Pa. 338: "Silence under certain circumstances may amount to a tacit admission of guilt." In *Com. v. Zorambo*, 205 Pa. 109, 112, 54 A. 716, we said that "silence in the presence of an accusation, when the one accused is at full liberty to speak is a circumstance to be taken into consideration by the jury, though at a judicial inquiry an accused may hold his head and his silence will be no evidence of guilt."

The trial judge said of the April 30th statement: "It is admitted only as evidence to be taken into consideration in passing upon the question of the credibility of the defendant and Valenti, as witnesses, and further, to be considered in connection with the question of punishment in the event that a verdict of guilty of murder of the first degree should be reached." In his charge the judge said: "I stated when admitting the statements that everything contained in the statements is to be considered by you only as it may affect or tend to affect the credibility of the defendant as a witness; in other words, whether or not the defendant furnished certain drugs and made a certain proposition to Valenti does not prove he was guilty of this crime. The statements were not admitted for that purpose, but only for the purpose of affecting his credibility." Near the close of his charge the judge said: "In arriving at your decision

as to the penalty, you should consider the kind of a man the defendant was, from his activities and habits, what the evidence disclosed about the gravity of the offense, whether or not it was wicked, brutal deed, or whether or not there is any evidence of extenuation, excuse."

The two statements on which all the preceding assignments of error are based do not relate in any way to the crime for which the defendant was being tried, but they relate to the murder of Charles Favato and to the sale by the defendant of the lethal germ laden "furtuna," for the promotion of murder. The admissions thus made or assented to here differ from the admissions received in evidence in *Com. v. Weston*, 297 Pa. 382, 388, 147 A. 79; *Com. v. Parker*, 294 Pa. 144, 143 A. 904; and *Com. v. Mellor*, 294 Pa. 339, 144 A. 534, in each of which cases the *confession of the crime charged* involved confessions of other crimes. In each of these three cases it was held that the confession was admissible *in its entirety*.

On the question of admitting evidence of other crimes so that the jury, under the Act of May 14, 1925, P. L. 759, 18 PS § 2222, may be guided in fixing the penalty, this court said in *Com. v. Williams*, 307 Pa. 134, 151, 160 A. 602: "We have admitted evidence of prior convictions and other offenses in aggravation of the penalty. . . . The fundamental objection to the introduction of such evidence is that the jury may be prejudiced by a familiarity with these prior convictions when considering the question of guilt or innocence. We endeavored to relieve this possible difficulty by directing the trial court to explain carefully to the jury the limitation on this evidence. . . . Evidence as to prior convictions to aggravate the penalty must be strictly limited. . . . Where the trial judge is convinced that such crime was committed for profit, . . . and that the criminals are habitual offenders against society, then prior convictions may properly be received by the jury as an aid in determining the penalty to be inflicted." In *Com.*

*v. Flood,* 302 Pa. 190, 195, 153 A. 152, we stated that "the trial judge should be very careful to explain and emphasize this limitation in his charge to the jury." In *Com. v. Clark,* 322 Pa. 321, 324, 185 A. 764, we reversed the court below because it admitted in evidence "to aid the jury in fixing the penalty," evidence that the accused had been imprisoned at one time in New York on a charge of drunkenness, and that on another occasion he was in a reformatory. We said: "The records of prior convictions should be limited to cases involving professional criminals who are a menace to society and wage war upon it for profit, and to cases of those who commit murders of a cold-blooded and atrocious nature."[9]

In the instant case there is in this record evidence, even aside from the statements complained of, that the defendant was engaged in murderous activities from sordid and mercenary motives. For example, when defendant testified in chief he explained that he first met Caruso in the Jewish Hospital (while the latter was recovering from injuries), that he went there because he had heard that Caruso "was a cracker-jack witch doctor," that Bolber had told him he wanted to engage or consult a witch doctor and that later he brought Bolber to the hospital to meet Caruso, and that he interpreted for Bolber the conversation which the latter carried on with Caruso. He testified that Bolber said to him in the presence of Caruso: "Now listen, I might as well

---

[9] In England where increased punishment is allowed for a subsequent felony it is provided by statute that "the jury shall not inquire concerning such previous conviction until after they shall have inquired concerning such subsequent felony and shall have found such person guilty of the same": Wigmore on Evidence, 2d ed., Vol. 1, sec. 196, p. 427. In California, which has a statute similar to our Act of 1925 giving the jury the right to fix the penalty in convictions for first degree murder, it was held by the Supreme Court of that state that the penalty must be based solely on the issues made by the indictment and plea: *People v. Witt,* 148 Pac. 928.

tell you the truth, I got a brother in New Brunswick, N. J., he is married, his wife worth $200,000, I want to learn something off of this man if I can kill my brother." When Petrillo interpreted this to Caruso, the latter said: "Well, I am not doing that kind of work. Sick people, I make them well, but I don't make them die."

In view of the fact that Petrillo was so flatly contradicted in nearly all of his material statements by agents and officers of the insurance companies and by police officers and others, we cannot hold that any substantial error was done him by the court's permitting defendant to be contradicted on a "collateral" matter by the two statements offered in evidence and dated respectively, April 28th and 30th, 1939.

The trial judge could have emphasized more clearly and forcibly than he did that the evidence contained in these statements was strictly limited to the question of what would be the appropriate penalty should the jury adjudge defendant guilty of murder in the first degree. However, in view of the fact that the trial judge did state when the testimony was admitted that "it was to be considered in connection with the question of penalty, in the event a verdict of guilty of murder in the first degree should be reached," and in view of what the court in its charge said on this point, we find no substantial error in the admission and use of these statements. The above assignments of error are all overruled.

Another assignment of error which the appellant stresses is the 8th. This is based upon the refusal of the court to withdraw a juror when the Commonwealth elicited from the witness, Sortino, the fact that he had pleaded guilty to the same murder for which the appellant was being tried, and that the degree of his guilt had been fixed at murder of the first degree and he had been sentenced to life imprisonment. When the defendant took an exception to this the court said to the jury: "I tell you to ignore and to put out of your minds any statements made heretofore as to what any other tri-

bunal has decided, whether that tribunal was composed solely of judges or otherwise. The law requires you to reach and to act upon your own and no one else's opinions and conclusions upon the fact of guilt or innocence of this defendant, and upon the matter of degree of guilt and upon the matter of punishment, and you are obliged under your oaths and the law to let any decision that you may make as a jury reflect only . . . your own collective minds." We think if there was any error in the permitting of the fact complained of to be brought out it was cured by the court's admonition. This court said in *Com. v. Fugmann,* 330 Pa. 4, 18, 198 A. 99: "There is seldom any criminal or civil trial of any magnitude or duration into the record of which some irrelevant, incompetent and immaterial testimony does not 'creep' and has been subsequently 'stricken out' and the jury instructed to 'disregard it.' To grant new trials whenever such a thing occurred would mean an interminable and intolerable succession of new trials. . . . If a trial judge or the appellate tribunal believes that the introduction of incompetent testimony subsequently stricken out or ordered disregarded, excites the jury's prejudice against a prisoner or that the jury disobeyed its instructions to base its verdict exclusively on the other evidence in the case, a new trial should be granted." The situation presented by this assignment does not call for the granting of a new trial. The Commonwealth's evidence, if accepted by the jury, made a verdict of guilty of first degree murder the only one which could be reached consistently. The knowledge that the co-principal Sortino received less than the death penalty was a fact tending to favor the defendant when the jury came to fixing the penalty in his case. This assignment is overruled.

The 7th assignment is based upon the court's admitting in evidence the fact that the appellant had negotiated on January 2, 1934, an application for a policy for $3,000.00 on the life of the deceased, for the purpose

of showing motive in appellant to commit murder. Since the defendant had no "insurable interest" whatever in Caruso, the fact that he applied for this insurance and made himself the beneficiary and described himself as Caruso's "nephew" was evidence from which the jury could legitimately infer that even at that time defendant was already planning the murder of Caruso for profit. This assignment is overruled.

The 3rd and 4th assignments are based upon the fact that the trial judge refused to permit defense counsel to examine prospective jurors as to whether or not they considered the death penalty or life imprisonment "the worst." These questions were manifestly improper. It must be assumed that every prospective juror regards the death penalty as the more extreme penalty. These assignments are overruled.

The 16th, 17th, 18th, 19th, 20th and 21st assignments are based upon alleged errors or inadequacies of the trial judge's charge and are overruled. The other assignments of error require no discussion.

In our opinion in the case of *Com. v. Petrillo*, 338 Pa. 65 (supra), we said that "both the ninth section of the Bill of Rights of the Constitution of this Commonwealth and the first section of the Fourteenth Amendment to the Constitution of the United States guarantee, in substance, to one accused of crime not only the forms but also the *fundamentals* of a fair trial." In the instant case our decision is that of none of these *fundamentals* was the appellant in this case deprived.

The judgment is affirmed and the record is remitted to the court below so that sentence may be executed.

Mr. Justice DREW and Mr. Justice LINN concur in this judgment.