Athas *v.* Fort Pitt Brewing Company, Appellant.

**314**

Argued October 12, 1936. Before KEPHART, C. J., SCHAFFER, DREW, LINN and STERN, JJ.

*W. W. Stoner,* with him *J. M. Stoner & Sons,* for appellant.

*George D. Wick,* with him *Ira C. Houck,* of *Campbell, Wick, Houck & Thomas,* and *Harland I. Casteel,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, November 23, 1936:

This case has been tried three times. On each occasion the verdict has been in plaintiff's favor in varying amounts. Called upon to review the third trial, we are required to give consideration to some of the testimony in the other two, and to depositions taken after the last one, in support of defendant's motion for a new trial, in which it is charged that the recovery is based upon testimony which is false.

As the alleged false testimony relates to a single factor in the case, the identification of a truck belonging to defendant, it will not be necessary to detail at much length the circumstances out of which the litigation arises. It will suffice to recount that plaintiff, who was engaged in painting a bridge which crossed a public street in Pittsburgh, was knocked from the scaffold on

which he was working and was seriously injured by a truck loaded so high that it could not safely pass beneath the suspended staging of the scaffold. The truck did not stop. The injured man could not identify it, but one of his fellow workmen, a Greek named Pitsis, who was on the scaffold at the time, testified by deposition that immediately following the accident he got to the ground, entered a passing automobile and followed the truck. He said the license plate on it was "Pennsylvania license Y 40." It is admitted that a truck bearing such a license number belonged to defendant at the time of the accident, but in its behalf denial is made that the truck was the cause of the accident, or was in the vicinity when it occurred. If the identification of the truck is established, defendant is liable; if not, it, of course, should not be mulcted in damages.

Before passing upon the critical inquiry in the case, the identification of the truck, we will without elaboration dispose of two other questions raised by appellant. It is argued that even if it was sufficiently shown that the truck belonged to defendant, there was no negligence in its operation. Our conclusion is that this question was for the jury. The driver of the truck, carrying such a high load, was bound to see whether there was clearance for it before he passed under the bridge. At some point under the bridge there was a red flag displayed indicating the necessity for caution. So too was the question whether plaintiff was contributorily negligent in standing where he did for the jury.

The testimony of a single witness, the Greek, George Pitsis, is relied upon for the identification of the truck. His deposition has been thrice taken, on the island of Rhodes in the Grecian Archipelago twice before the first trial, and again, after the third, in support of defendant's motion for another venire. The testimony as given is not in the most satisfactory shape so far as convincingness is concerned. On analysis it shows conflicting statements in particulars quite material.

In his first deposition, the witness recounted what took place after the accident and after he got down from the scaffold to the ground in this way: "I jumped into an automobile and followed and was able to take the number. I took the number of the automobile truck, which was Y 40." When he got back to the bridge, plaintiff had been removed to the hospital. In his second deposition, the witness stated that he got into the passing automobile and requested the driver to follow the truck which was in sight when he reached the ground. He did not know who was the driver of the automobile. The driver was not produced at the trial. Another person he said was sitting with the driver. On his return to the bridge, he gave his foreman, Jim George, the number of the truck. On his third deposition, the witness testified that he was not able to read written or printed English words. He did not know the English alphabet. Being asked to write in English the words "Pennsylvania license number L., forty-five. License number Y twenty-six. Ward J," he stated, "I cannot write any word from this question." In answer to the interrogatory whether he was able to read written or printed words in the Greek language, he said, "Yes. In practice. I have not been at school." In reply to further interrogatories, he stated that he knew the Greek alphabet, but could not read or write any language. Asked whether it was not the fact that he had not followed the truck and did not take the license number, but was told by others to say that he had, he replied: "I have followed myself the truck and with the help of the driver I have stated the license number of it. Nobody have told me to say what in fact I did." To the specific question whether he took the number himself or whether some one else told him the number, he answered: "Myself, with driver's help." Explaining how he took it, he said: "I do not remember well. I think that after meeting the truck, the driver of my car, wrote on my demand, the license number." He added, "I judge that these had

been written by the auto driver and then given to me. It may be also that I may have asked the necessaries of the auto driver for the purpose of making the writing myself." He further stated because he was in working clothes he did not have paper and pencil and that the paper was the driver's and that the license number was written by the driver with a fountain pen. The paper produced is written in lead pencil. He added that they had followed the truck for about ten minutes before the number was taken. In his last deposition, he said, contradicting his former statement, that only the driver was in the automobile and "I sat near the driver." In his first deposition, Pitsis says he took the number himself. In the third, that he took it with the driver's help. "The driver of my car wrote it on my demand." On his first deposition, Pitsis did not mention the paper. In his third deposition, he said he gave the piece of paper with the license number on it to his foreman, Jim George. On the piece of paper which was produced for the first time at the third trial was written in lead pencil: "Pennsylvania license Y 40." On the reverse side also in lead pencil was written "Ward J." He identified the paper as that which he gave to Jim George, but could not explain the meaning of the notation "Ward J."

Judge MOORE of the court below in his dissenting opinion says: "We think the testimony, by deposition, of the witness Pitsis as to the paper claimedly bearing a notation of the license number of the truck involved in this accident, taken, allegedly, while Pitsis and an undisclosed motorist were engaged in pursuit of said truck, is so incredible as to mark it as a mere connivance to tie defendant company into this claim. To allow the verdict to stand, as it must necessarily stand, on such apparently false basis of identification of the truck in question, is to defeat the ends of justice."

We think this testimony leaves in serious doubt, whether the witness himself saw the number on the truck or whether the driver of the automobile conveyed to the

witness what it was. If the latter is the proper conclusion, then the testimony of the witness was hearsay; he was repeating what the driver had said to him and had written for him. The court below thought it made no difference whether the driver or the witness recognized the number, deeming the declaration of the driver part of the res gestæ and, therefore, admissible. We cannot agree with this conclusion. The statement of the driver bears none of the attributes of res gestæ. It was not spontaneous, made under the excitement which the accident brought about. It was remote in point of time. It did not spring out of the litigated act, the accident, and did not relate to it. The driver was not a witness to the accident, and the statement was not of something which occurred in, and at the time of the accident, and did not relate to the accident itself: *Deater v. Penn Machine Co.,* 311 Pa. 291, 166 A. 846. As we said in that case (p. 295) : "The res gestæ rule is an exception to the hearsay rule. It is a dangerous rule, as all the text-writers agree, and we think it ought not to be extended beyond the limits of reasonably immediate, spontaneous declarations relating to the controverted fact, in this instance, to the accident." Res gestæ declarations "ought to be confined to those utterances, made in connection with a startling event by one laboring under the stress of nervous excitement caused by it": *Com. v. Gardner,* 282 Pa. 458, 465, 128 A. 87, 90. We can imagine nothing more dangerous in applying the res gestæ rule than to permit it to cover hearsay statements made by a person, not concerned in or witnessing an accident, that he saw the license number of a motor vehicle moving away from the scene, and thus fix the owner of the hearsay-identified car with responsibility. Either the driver of the automobile in this case must be produced to identify the truck and be cross-examined, or, it must be clearly established that Pitsis himself identified it.

Another matter to be taken into account is that James Nee, a witness called by defendant on the third trial,

testified that as he was driving his truck toward the bridge on which plaintiff was working, a truck belonging to the Loeffler Box Company passed him. It was loaded high with boxes. As it went under the bridge he saw a man fall on the street. He pulled up alongside the man, asked if he desired to be taken to a hospital and received an affirmative reply; the injured man was put in the truck of the witness and taken by him to the Allegheny General Hospital. If this witness is to be believed, the defendant's truck did not cause the accident. It was caused by the truck of the Loeffler Box Company. He was corroborated to some extent by his employer to whom on his return to his place of employment he reported the accident and the fact that he had taken the injured man to the hospital.

After the third trial, on an allegation of after-discovered evidence supported by the affidavit of one George L. Brady, the court permitted his deposition to be taken at Akron, Ohio. Brady testified that at the time of the accident to plaintiff, he was an "ambulance chaser" in Pittsburgh, that he was notified by an orderly in the Allegheny General Hospital that there was an injured man there who was a Greek. Brady went to the hospital with another man who spoke Greek, saw the plaintiff, had him sign a power of attorney and ascertained that he could not identify the truck which had injured him. Knowing that defendant's trucks passed under the bridge, Brady saw one a few days later with the Pennsylvania license number "Y 40" on it. He put this on a piece of paper which he tore from a magazine (the scrap of paper gives this impression), added "Ward J" to the other side of the piece of paper, indicating the ward in the hospital in which plaintiff was confined and gave this paper to the foreman, Jim George, and arranged with him that he should have one of his men say that he followed the truck which had caused the accident and had taken the number. This paper he said was the one produced for the first time on the third trial. The wit-

ness identified the writing on it as his and said his purpose in preparing it was to "pin" the case on the defendant. Brady also said that he had gone to defendant's plant to verify the fact that the number he had written on the paper corresponded with the number of one of its trucks. It is urged upon us by plaintiff's counsel, as it was upon the court below, that this witness, because of his past record, is unworthy of belief. His testimony in certain of its important features was contradicted by other witnesses and there would seem to be certain inconsistencies in it. Without his testimony, however, there is no explanation of the words "Ward J" on the paper. Full effect does not seem to have been given by the majority of the court below to the notation "Ward J" on the paper. The driver of the automobile could not have written this. He knew nothing about "Ward J." Pitsis could not have written it. He cannot write. Who did write it? Brady says he did, and gives the reason for his doing so, because he had seen plaintiff in that ward of the hospital. If this is so, then he necessarily wrote everything else on the scrap of paper and Pitsis' story is false. If Brady wrote what is on the piece of paper, it was done for the purpose of fraudulently "pinning" responsibility on defendant.

No jury has heard the third deposition of Pitsis. It was taken after the third trial. None of the three juries who heard the case knew that he could not read or write any language. No jury has heard the deposition of Brady. No jury has had the benefit of the analysis of this testimony of Pitsis and Brady by counsel or court. We are of opinion that this is at least a doubtful case and that justice cannot be done until the entire testimony as now presented is put before a new jury under most careful instructions by the trial judge.

The judgment is reversed and a new trial awarded.