Commonwealth *v.* Noble, Appellant.

Argued April 22, 1952.   Before DREW, C. J., STERN, STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*William P. O'Neill,* with him *Perrin C. Hamilton,* for appellant.

*Michael von Moschzisker,* First Assistant District Attorney, with him *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, May 26, 1952:

The defendant was found guilty of murder in the first degree and sentenced to life imprisonment. The case turned on whether he murdered Ezekiel Evans or killed him in self defense. The lower Court refused defendant's motion for a new trial and from the refusal of his motion defendant has appealed.

The important facts are as follows: Defendant had been living with Marie Evans for several years. She was a married woman with four children and had been separated from her husband, Ezekiel Evans, for 9 years. In spite of this so-called separation, her husband apparently visited her three room apartment several times each week and frequently spent the night there.

Early in the evening of Saturday, February 3, 1951, defendant, as was his usual practice, came to Marie Evans' apartment. No one was there except her husband. Defendant thereupon left the apartment, but returned, according to his testimony, several times later on in the evening, leaving each time because of the continued presence of Ezekiel. Early the next morning, viz., Sunday, February 4th, at an undisclosed time, defendant came back, as he stated to obtain his overcoat. He was admitted by Ezekiel. Marie Evans was in a drunken sleep in the kitchen. One of the children, Ella Jean Evans, was asleep in a chair in the living room; Ella May Evans, aged 14, and Albert Evans, aged 12, were asleep in the bed in the bedroom. Ezekiel Evans was later found dead, lying along the foot of the bed with his head overhanging the side of

the bed, face down. A pool of blood was on the floor directly under his head.

Ella Jean testified she went to bed about 10:30 or 11 o'clock and at that time her father was on the bed with her sister and brother. "He was laying on the left hand side of the bed, at the foot of the bed". The testimony did not disclose when Ella May and Albert went to bed, but when they did so their father was lying on a couch in the bedroom near the door across from the foot of the bed.

All of the occupants of the apartment denied having witnessed the killing or any struggle. When Albert woke up he saw his father lying at the foot of the bed with a hole in his head, ran into the living room, awakened his sister, looked out the open front window and saw the defendant rounding the street corner. When Ella Jean awoke and saw her father she first called her mother, then a neighbor who lived upstairs, and then went to get the police.

The theory of the Commonwealth was that this was a cold-blooded planned murder; that defendant killed Ezekiel while he was asleep on the bed where he was subsequently found by his children and the police. The theory of the defense was that the killing was in self defense and therefore excusable; that it resulted from an unprovoked assault by deceased with a butcher knife and that the defendant could only avoid the assault by retaliating.

Defendant testified that when he came back for his overcoat, Ezekiel, who was a larger man and had previously threatened him and cut him, accused him of stealing his suit and came at him with a butcher knife; that he grabbed the upraised arm of Ezekiel (in spite of the fact that defendant's arm had been fractured shortly before and it was in a sling when he first came to the apartment that Saturday afternoon); that he picked up a hammer by the cot, hit Ezekiel on the head

with it twice and as Ezekiel fell on the bed, hit him a third time, because he was afraid and frightened. Defendant also testified that at the first blow Ezekiel dropped the knife and he kicked it toward the kitchen. The testimony as to the knife, which was never found by the police, was confused and contradictory.

Three of the contentions raised by defendant are worth discussing. The first contention is that the Court committed basic and fundamental error in its charge to the jury concerning the burden of proof of self defense. Obviously the question of self defense was the most important question in the case; on it hung defendant's sole chance of acquittal. The Court's charge on this point was as follows: "Since self defense is an affirmative defense, the elements required to support it must be proved by the defendant beyond a reasonable doubt, unless they appear from the facts and circumstances in evidence."

Self defense is an affirmative defense which must be proved by a preponderance of the evidence; and therefore the above mentioned portions of the Court's charge constituted basic, fundamental and reversible error: *Commonwealth v. Burns,* 367 Pa. 260, 80 A. 2d 746; *Commonwealth v. Ross,* 266 Pa. 580, 110 A. 327; *Commonwealth v. Molten,* 230 Pa. 399, 79 A. 638; *Commonwealth v. Deitrick,* 218 Pa. 36, 66 A. 1007; *Commonwealth v. Gerade,* 145 Pa. 289, 22 A. 464; *Meyers v. The Commonwealth,* 83 Pa. 131; *Commonwealth v. Bryson,* 276 Pa. 566, 120 A. 552; *Commonwealth v. Weinberg,* 276 Pa. 255, 120 A. 406; *Commonwealth v. Iacobino,* 319 Pa. 65, 178 A. 823.

The Court then charged that the burden was on the Commonwealth to prove the defendant guilty beyond a reasonable doubt and correctly and extensively defined a reasonable doubt. Following this, the Court exhaustively reviewed the evidence—its charge on this and related points covered 31 printed pages. The trial

Judge then said: "My court reporter tells me that I made a slip in charging about the elements of self defense. I said it is an affirmative defense and must be proved by the defendant. I should have said by a preponderance of evidence; I said beyond a reasonable doubt. In other words, the burden on the defendant is less than the burden on the Commonwealth."

Where the defense is self defense it is not necessary to define (as defendant contends) the words "preponderance of the evidence", although it would be better practice to do so: Cf. *Commonwealth v. Yancer*, 125 Pa. Superior Ct. 352, 189 A. 684; *Commonwealth v. Colandro*, 231 Pa. 343, 80 A. 571.

In *Commonwealth v. Yancer*, 125 Pa. Superior Ct. 352, 356, 189 A. 684, that Court correctly said: "Our courts have uniformly held that defenses of insanity, self-defense and alibi are affirmative defenses and the burden of proving such defense, by a fair preponderance of the evidence, is placed upon the defendant: Com. v. Colandro, 231 Pa. 343, 80 A. 571; Com. v. Stein, supra; Com. v. Iacobino, 319 Pa. 65, 178 A. 823. We recognize that in alibi cases it is the duty of the court to fully advise the jury as to the difference between the burden of proof resting upon the Commonwealth to establish guilt and that resting on the defendant with respect to the alibi set up;* but we find no authority in this state requiring such instructions in a plea of self-defense, although we see much ground for distinction in not requiring such instructions with respect to such plea. Unlike insanity, self-defense, excusable homicide, etc., an alibi defense does not admit

---

\* To which we add: *Commonwealth v. New*, 354 Pa. 188, 47 A. 2d 450, where this Court said (p. 214): "The jury must also be instructed that 'the evidence in support of the alibi may, with other facts in the case, raise the reasonable doubt of guilt which entitles a defendant to acquittal'."

the act charged and set up something by way of palliation or excuse; it denies the commission of the offense by the defendant, by asserting that he was somewhere else at the time: Com. v. Stein, 103 Pa. Superior Ct. 198, 158 A. 600."

However, what disturbs us about the Court's charge on this point is that it was much more than a slip—it was a basic fundamental error of law on the most important issue in the case and we believe that the trial Judge's correction of his mistake was under all the facts and circumstances of this case, insufficient and inadequate.

Moreover, we find a more serious error in the admission of the testimony of Officer Oblon when he was permitted, over objection, to testify in direct examination in the Commonwealth's case: "I asked Ella May who had done it . . . . Well, she told me that Willie Noble struck her father over the head with a hammer—while he was lying there in bed." This hearsay evidence was admitted as part of the res gestae. It is undisclosed how soon after the decedent's death or its discovery by Ella May, this conversation occurred; but since one of the children had gone out to get the police and the police had come to the apartment and then gone outside to call a police wagon and then returned, it is likely that at least half an hour must have elapsed. Ella May's statement was neither spontaneous nor within the reasonably immediate time-limits allowed by the rule of res gestae: *Athas v. Fort Pitt Brewing Co.*, 324 Pa. 313, 188 A. 113; *Deater v. Penn Machine Co.*, 311 Pa. 291, 166 A. 846; *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87; *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99; *Commonwealth v. Rumage*, 359 Pa. 483, 59 A. 2d 65.

It may be well to review some of these decisions. " 'The res gestae rule is an exception to the hearsay rule. It is a dangerous rule, as all the text-writers

agree, and we think it ought not to be extended beyond the limits of reasonably immediate, spontaneous declarations relating to the controverted fact . . . .' Res gestae declarations 'ought to be confined to those utterances, made in connection with a startling event by one laboring under the stress of nervous excitement caused by it': Com. v. Gardner, 282 Pa. 458, 465, 128 A. 87, 90": *Athas v. Fort Pitt Brewing Co.*, 324 Pa. 313, 318, 188 A. 113. In *Deater v. Penn Machine Co.*, 311 Pa. 291, 166 A. 846, Mr. Justice, later Chief Justice SCHAFFER, said (page 295): "In Com. v. Gardner, 282 Pa. 458, Mr. Justice KEPHART, speaking generally of res gestae declarations, said, (page 465): 'Their sole distinguishing feature is that they should be the necessary incidents of the litigated act,—necessary, in this sense, that they are part of the immediate preparations for, or emanations of, such act.' "

Spontaneous exclamations or declarations uttered during or immediately preceding or following the actual infliction of wounds or springing out of the actual commission of the crime, are admissible as within the res gestae rule: *Commonwealth v. Rumage*, 359 Pa. 483, 486, 59 A. 2d 65; *Commonwealth v. Gardner*, 282 Pa. 458, 128 A. 87. Moreover, such declarations are not objectionable because made in response to questions: *Commonwealth v. Rumage*, 359 Pa., supra; *Commonwealth v. Harris*, 351 Pa. 325, 41 A. 2d 688; and the exclamations or declarations of mere bystanders are admissible: *Coll v. Easton Transit Co.*, 180 Pa. 618, 37 A. 89; *Commonwealth v. Fugmann*, 330 Pa. 4, 198 A. 99.

No definite time-limit or distance from the crime or event in issue can be fixed by the Courts to determine what spontaneous utterances are admissible; each case must depend on its own facts and circumstances: *Commonwealth v. Gardner*, 282 Pa., supra; *Commonwealth v. Stallone*, 281 Pa. 41, 126 A. 56. However,

even a spontaneous declaration which is sufficiently close to the time of the crime to be admissible, is inadmissible when the declaration expresses a conjecture and not a perception or knowledge: *Commonwealth v. Fugmann,* 330 Pa., supra.

In the instant case it does not clearly appear whether Ella May's declaration was based on perception or conjecture, but in any event it was, we repeat, reversible error to admit it because it was not a spontaneous declaration nor sufficiently close in point of time to bring it within the rule of res gestae.

Furthermore, this basic error was not cured, as the Commonwealth contends, by the fact that subsequently the defendant himself testified that he hit Ezekiel Evans on the head with a hammer once while Ezekiel was on the bed. The prejudicial effect of this highly important hearsay testimony could not be overcome by the defendant's subsequent testimony for the twofold reason (1) that it would still have been inadmissible either in the Commonwealth's case in chief or in rebuttal; and (2) that it created a different impression of the killing and this impression was and remained prejudicial to the defendant.

Since this case unfortunately has to be retried it may be well to point out that the testimony of Ora Dorsey which was offered in rebuttal to impeach the credibility of Marie Evans, was based upon hearsay and was therefore inadmissible: Cf. *Commonwealth v. Petrillo,* 341 Pa. 209, 223, 19 A. 2d 288; *Commonwealth v. Kline,* 163 Pa. Superior Ct. 408, 62 A. 2d 73.

Judgment reversed and new trial granted.