369 A.2d 283

**COMMONWEALTH of Pennsylvania**

**v.**

**Andrew EASLEY, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 30, 1975.

Decided Nov. 22, 1976.

42

44

John W. Packel, Assistant Public Defender, Philadelphia, for appellant.

Steven H. Goldblatt, Assistant District Attorney, and F. Emmett Fitzpatrick, District Attorney, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

Appellant was tried before a judge and jury on indictments charging simple assault and aggravated assault,

carrying a firearm on public streets or public property in a county of the first class, unlawfully carrying a firearm without a license, and conspiracy.[1] He was adjudged guilty of all charges except conspiracy, of which he was acquitted.

The facts viewed in the light most favorable to the Commonwealth and fully supported by the evidence are as follows: Around 5:30 in the afternoon of September 5, 1974, Linda Wilson was in her high-rise apartment number 11F on the eleventh floor of the Wilson Park Project at 2508 Jackson Street in Philadelphia, with her two children, ages 9 and 8. She was ironing and frying some chicken. A loud knock came at the door; she asked who it was and a man's voice answered "Bo," whom she knew as Andrew Easley. She opened the door, he pushed his way in (he was followed by his brother who was not being tried) shoved her backwards against the refrigerator, pointed a small black gun at her and said he'd blow her brains out because she beat his mother. She fell to the floor, he kicked her in the thigh, he threw the hot grease from the frying pan on her and he seized a dish rack and beat her with it. He tried to fire the gun but the bullets kept just jumping out and falling on the floor. He demanded that she get up and give him her "sister's" address. When she arose he grabbed her by the robe and swung her (he is 6 feet tall, she is 4 feet 11 inches) into the living room. There he picked up a glass flower bottle and struck at her. She fended the blow with her arm; the bottle broke into pieces. She went into her bedroom to get the address he had demanded, she wrote it on an envelope; then he hit her, knocked her onto her bed, then he shot her through the chest. In response to her alarm, neighbors called the police who came to the apartment and arrested the two Easley brothers who had returned to retrieve Andrew's jacket

---

1. Act of December 6, 1972, P.L. 1482, § 1, 18 Pa.C.S. § 2701, 2702, 6108, 6106 and 903 respectively.

from the Wilson apartment in which jacket he had his car keys. A neighbor had seen appellant and his brother enter the Wilson apartment, with appellant holding a small gun in his right hand. The police found a bullet on the bed and a spent shell on the floor of the bedroom. Ballistic tests showed that the bullet had been fired from the .25 caliber automatic gun found on the appellant.

The appellant's version of the shooting was somewhat different. He admitted he went to the apartment of Linda Wilson on the late afternoon of September 5, 1974, with his brother accompanying him, that he knocked on the door, that Linda asked who it was, that he said it was "Bo" and that she let them in. He said he put his jacket across the chair and sat down, that she offered him some wine from a bottle, that he started to ask her about his mother (Linda had taken his mother to the hospital and appellant had brought Linda back from it), and, when he mentioned the $1,400 that his mother "had got," that Linda became "disturbed". He said she tried to "dash" a pan of grease on him, that he jumped out of the way; then she got a gun from between the stove and the sink and pointed it at him; that he grabbed the wine bottle, threw it at her, rushed her and grabbed the gun. He said they tussled over the gun and while doing so it fired, and she was shot while they were in the kitchen. He said he took the gun from her, "rejected" the bullets, picked up some shells from between the stove and the sink, and was going to take the gun and the shells over to the police. He said he ran into the police while he and his brother were going downstairs. He testified that he was going to tell the police about the accident; however, when he ran into the police he said he "asked them would it be all right with him if I remain silent", and the detective said "you can do what you want to do". Appellant testified that he received no warning of his constitutional rights. He did in fact, however, remain silent.

■ The appellant raises some ten issues, not all of which issues have been preserved for appeal. He complains first that the trial judge should not have charged that the appellant-defendant had the burden of proving self defense. The pertinent part of the court's charge was as follows:

"Now, the person who is accused of the crime is not required to present any evidence or prove anything in his own defense, except, of course, with respect to self defense which is the defense of the defendant in this case as his lawyer said to you."

The Commonwealth points out that appellant in his points for charge requested the court to charge that the burden of proving self defense was upon the defendant. His requested charge number 15 was as follows:

"15. If the evidence presented by Mr. Easley concerning his claim of self defense, either alone or together with the evidence in the case, convinces you by a preponderance of the evidence that he was attacked by the complainant and that his actions were induced by a reasonable belief that he would suffer bodily harm, then you must find Mr. Easley not guilty. *Commonwealth v. Noble,* 371 Pa. 138, 88 A.2d 760 (1952)."

This requested charge places the burden of proving self-defense on the appellant. The court charged as requested and appellant cannot now properly complain that he didn't want that charge even though he requested it.

■ Appellant next argues that if the trial court was correct in saying that the defendant had the burden of proving his claim of self-defense, the court should have defined that burden. Without being instructed that the proof required was by a preponderance of the evidence, appellant claims the jury might have thought appellant was required to prove this defense beyond a reasonable doubt. There is nothing in the charge which would tend to indicate any reason for the jury to believe that proof

of self-defense should be beyond a reasonable doubt; however the appellant in his exception to the court's charge did not call to the attention of the trial judge that he wanted a charge on this standard of proof. He thereby abandoned that part of his point for charge that proof of self-defense should be by a preponderance of the evidence. *Commonwealth v. Raison*, 458 Pa. 378, 326 A.2d 284 (1974); Pa.R.Crim.P. 1119(b).

The appellant next raises the issue relating to the comment of the attorney for the Commonwealth relating to the failure of the appellant to tell the police about the gun and the accidental firing of it. He testified on direct examination that he intended to take the gun and shells to the police.[2] On cross-examination he testified that he took the gun, bullets, and clip, and was going to the police to tell them about the accident and to get help.[3] In his closing address, the attorney for the

2. At T 205 and 206 the transcript of direct examination shows:
"Q   And what was your intention in rejecting those bullets?
"A   I was going to take the gun and the shells and go over to the police station.

.    .    .    .    .    .    .    .    .

"Q   How about the box of shells, why did you take that?
"A   See, I was taking all that to the police, you know, like I had panicked sort of, you know, in a way."

3. "Q   You didn't tell the Detective what you told us today, did you?
"A   No, sir, no, sir.   About the accident, no, sir.
"Q   You said you were going over there to tell the police, to get help from the police, didn't you?
"A   Yes, sir.
"Q   That was your reason for leaving the apartment; isn't that what you testified?
"A   Yes, sir.
"Q   Why didn't you then tell them?
"A   When the police stopped me they said, 'Halt,' and one officer said 'Well, that's him,' or something like that there.   And so, you know, I didn't say anything to them.
"Q   You didn't say anything to the Detective?
"A   No, sir.
"Q   The detective wasn't there at the scene arresting you, was he?
"A   The detective tried to say—they was trying to say, you know, that I had shot Miss Linda Wilson.   So, I was—you

Commonwealth argued to the jury the unlikelihood that appellant ever intended to go to the police and tell them what happened. His words were as follows:

"He said he was going to walk down over to Wolf Street, and conveniently he was going to take the bullets, he was going to take the clip, he was going to tell the police just what happened. Unfortunately for him someone called the police in the meantime and they catch him and his brother coming down the stairs.

Now, at that time does he tell the police? He has the right to remain silent. You have heard that. You know that. But he told us here he is going to tell the police the whole thing was an accident. Does he ever tell anybody that? Now today he does. After he has access to all these notes for five or six months.

MR. WALLS: Objection, Your Honor.

THE COURT: Overruled."

The law is clear that the prosecution may not comment that silence by the accused, either at trial or at the time of arrest, is evidence of guilt. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Commonwealth v. Stafford*,[4] 450 Pa. 252, 299 A.2d 590 (1973); Cf. *Commonwealth v. McLaughlin*,[5] 230 Pa.Su-

know, I didn't say anything to them. I asked them would it be all right with him if I remain silent, and he said yes.
"Q After you asked the detective that he didn't ask you any more questions did he?
"A No, sir. He said, 'You can do what you want to do,' just like that. And he went out the room.
"Q Did he warn you of your Constitutional rights?
"A No, sir.
"Q He didn't read a little card to you?
"A No, sir, not that I remember. No, sir."

4. In *Stafford* the exculpatory evidence was an alibi. In *McLaughlin* it was that appellant entered the complainant's apartment to see why a baby was crying and not with any criminal intent.

5. *McLaughlin* was decided on the lack of proof that a crime had been committed by the defendant. His motion in arrest of judgment was granted by us because "The facts of this case are such that the intent to commit any crime let alone 'larceny', has not

per. 420, 326 A.2d 474 (1974). The attorney's comment here does not ask for an inference of guilt, but asks that appellant's silence at the time of arrest be considered as affecting his credibility. Appellant testified at trial, in substance, that he was fleeing the apartment where he was involved in a shooting of a woman, in order to go to the police and tell them it was an accident and to give them the gun and some bullets. When he was caught by the police in the apartment building from which he was fleeing, he said nothing to them about an accidental shooting or about a gun, but on the contrary, without being warned to remain silent, he said he wanted to remain silent.

In none of the cases relied upon by the appellant did the accused testify at trial that he intended to seek out the police. In none of them did he say he was going to tell the police what had happened. The exculpatory testimony had no relationship whatever to the police or to talking to them. Here appellant said on the witness stand that he intended to go to the police and to tell them about the accidental shooting and to show them the gun. When he came into the presence of the police he not only said nothing about the accident or the gun, but affirmatively told them he wanted to be silent.

The cases of *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99, and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, both treat of silence of an accused in a criminal case. *Hale* holds that it is prejudicial error for the trial court to allow cross-examination of a defendant concerning his silence during police interrogation. *Doyle* holds that the use for impeachment purposes of a defendant's silence at the time of arrest, after receiving Miranda warnings, violates the

been proven." Our statement in that opinion that the trial judge should not have resolved the credibility issue in favor of the Commonwealth because of the defendant's silence at the time of arrest was dictum.

Due Process Clause of the Fourteenth Amendment. The trial judge did not have the benefit of these decisions, inasmuch as they were decided after the trial of the case at hand. However the instant case is distinguished from *Hale* in that there is no problem concerning the cross-examination of appellant about his silence, nor was there any objection to it. Furthermore, the instant case is distinguished from *Doyle* in that the decision in *Doyle* turned largely on the fact that the defendant in all likelihood remained silent because he had been warned to do so by Miranda warnings. In the instant case the appellant denied receiving Miranda warnings. He could have been encouraged or induced to remain silent by Miranda warnings.[6] Since appellant was not influenced to remain silent by any Miranda warnings, *Doyle* is not applicable. Even were the trial judge in error in allowing the comment on appellant's silence at the time of his arrest, it would have been harmless error beyond a reasonable doubt for the reason that the other evidence in the case is overwhelmingly against appellant.

■ Appellant complains that the trial judge erred in refusing a request for an additional charge (not included in appellant's points for charge) as to justification under § 503 of the Crimes Code. Whether or not the court should have acceded to counsel's request is of no moment, for the reason that the record shows that appellant was asking for an additional charge under § 504, subsection c–(2), which provides: "The justification afforded by subsection (a) of this section applies: . . . (2) when the actor believes his conduct to be required or authorized to assist a public officer in the performance of his duties, notwithstanding that the officer exceeded his legal authority." A charge concerning justification along the lines requested by counsel was clearly not called for. Appellant having relied on a specific section of the Code

6. The police testified that appellant was given his Miranda warnings but appellant says he was not given them.

(viz., § 504c–(2)) and urged the court to charge in accordance with that section, cannot now claim the court erred on a basis (§ 503) entirely different from that which he advanced at trial.

■■ The Appellant next complains that in its charge the court overemphasized the appellant's interest in the outcome of the case in stating appellant's testimony so as to make it appear incredible, and in suggesting that there was no basis on the record for questioning the credibility of the complaining witness. The trial judge discussed at great length the many factors to be considered by the jury in determining the credibility of the witnesses. With respect specifically to his charge on credibility relating to the defendant's testimony, the charge was as follows:

> "Also, you may check each witness who testified and see what their attitude was when they were on the stand, when they testified regarding the testimony they gave. Was it an attitude of carelessness, frankness? Of course, in this case I told you that a defendant does not have to take the witness stand. In this case, of course, the defendant chose to take the witness stand. In considering the defendant's testimony you are to follow the general instructions that I gave to you and that I am giving you now for judging the credibility of any witness. In other words, you apply the same tests to him as you do to all the other witnesses.
>
> In weighing the defendant's testimony you may consider the fact that he has a vital interest in the outcome of the case. You may take the defendant's interest into account along with all the other facts and circumstances bearing on credibility in making up your minds what weight his testimony deserves."

We see nothing wrong with this charge and find that it does not overemphasize the appellant's interest in the

outcome of the case. With respect to the manner in which the court stated appellant's testimony and with respect to whether or not there was any improper suggestion in the charge that there was no basis on the record for questioning the credibility of the complaining witness, the appellant took no exception to what the court said in respect to either of these two areas. These issues were not preserved for appeal and we cannot consider them. Nevertheless, a thorough review of the court's charge reveals a careful effort on the part of the trial judge to give accurate and impartial instructions to the jury.

Appellant further complains that the court erred in allowing the District Attorney to tell the jury on *voir dire* that the complaining witness's children were living with her brother in California. This statement by the District Attorney in his opening remarks to the jurors, preceding the time of selection of the jury, was followed up by testimony of the victim establishing the residence of the children in California. It was certainly pertinent for the jury to know where her children were.[7]

Appellant further complains that the court charged that the jury could not draw an inference from evidence not produced at the trial. We see no error in this statement by the court when considered as part of the whole charge.

Appellant raises a further issue by claiming the court erred in allowing the District Attorney to suggest that the jury could infer that the testimony of the brother, John Easley, would have been unfavorable to the appellant, had he been called to testify. In this connection the court charged as follows:

"During the course of the arguments in this case I think the District Attorney had asked where is John

7. Nothing in the record indicates that the children saw what occurred in this incident; they were in another part of the building when it was over.

Easley. That is none of your concern. John Easley does not have to be on the stand. The defendant does not have to put him on the stand, because this is the defendant who is on trial and, therefore, John Easley does not have to take the stand. This defendant does not have to present any witnesses."

Whatever impropriety there may have been in the District Attorney's comment, the charge of the court clearly cured it.

■■■ Appellant further complains about the court's not charging the jury that it could draw a negative inference from the fact that the Commonwealth failed to call appellant's brother John as a witness. John Easley was equally available to both sides. He was charged with offenses arising out of this same incident and there was no obligation on the Commonwealth to call him.

A thorough review of the proceedings in this case discloses that as a result of the efforts of many people, appellant had a full and fair trial.

Judgment of sentence affirmed.

CERCONE, J., files a dissenting opinion in which HOFFMAN and SPAETH, JJ., join.

CERCONE, Judge, dissenting:

The following excerpts from the case of *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973) support appellant's contention that the prosecutor's comment concerning appellant's silence at the time of his arrest was prejudicial error:

"The Fifth Amendment protects the accused's right to remain silent and it is of no moment that in the instant case the appellant remained silent at the time of his arrest. To allow comment on his silence at the time of arrest would also make the assertion of his privilege costly. . . . That the appellant himself brought his silence, at the time of his arrest, to the

jury's attention does not justify the prosecutor's grasping the opportunity to suggest that the appellant's guilt be inferred from his silence at that time." 450 Pa. at 263, 299 A.2d at 596.

In *Stafford* the prosecutor's comment was as follows:

"And then you've heard, this defendant at about 9:10, he's arrested, 9:00 o'clock he's arrested, brought down to the District Attorney's office, advised of his rights; where were you, what did you do, he doesn't have to say a word, nothing. He can sit there in complete silence on his constitutional rights, and that's what he does. And you've heard from his own mouth that that's what he's done, up until yesterday . . . up until yesterday. You weigh that, in your deliberations. And you heard the contents, in essence, of this statement." 450 Pa. at 262, 299 A.2d at 595.

The Commonwealth does not contend, nor would I find, that the comment in the instant case was any less prejudicial than was the comment in *Stafford*. However, the Commonwealth argues that *Stafford* is distinguishable because the prosecutor's reference to appellant's silence in the instant case was used specifically to contradict appellant's claim that he was fleeing the premises in order to find the police. While this might have been the use intended by the prosecutor, the comment nevertheless implied to the jury that appellant's silence at the time of his arrest was evidence of his guilt. In my view, this violates the holding in *Stafford* and thus requires reversal. See also *Commonwealth v. McLaughlin,* 230 Pa.Super. 420, 326 A.2d 474 (1974).

HOFFMAN and SPAETH, JJ., join in this dissent.