381 A.2d 967

**COMMONWEALTH of Pennsylvania**

v.

**George W. DUGAN, Appellant.**

Superior Court of Pennsylvania.

Submitted March 14, 1977.

Decided Dec. 28, 1977.

378

John D. Flinchbaugh, Assistant Public Defender, York, for appellant.

Donald L. Reihart, District Attorney, York, for Commonwealth, appellee.

Before WATKINS, P. J., and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

VAN der VOORT, Judge:

Appeal is taken to this Court from judgment of sentence rendered following jury verdict of guilty to the indicted charge of rape, a demurrer to the additional indictment of aggravated assault having been granted during trial.[1]

We consider the testimony favorably to the verdict winner. In the early morning hours of February 13, 1975, an 18-year old female student at a York college was walking the three or four blocks from a friend's home to her apartment. When she had walked one block, she was accosted by an unidentified man, who wrestled her to the ground. Screaming and breaking loose, the victim noticed appellant's car approaching nearby. The first assailant disappearing, the victim ran the short distance to appellant's vehicle, whereupon appellant offered help or a ride to the police station. The young woman got into the car, and appellant drove a few blocks, stopping at a parking area behind the York County Jail. After asking "How do you know I'm not going to do the same thing to you," appellant grabbed the woman, pushed her down on the car seat, hit her three times about the head, and forced her at knife point to disrobe. Forcible sexual intercourse with penetration by appellant ensued. Two hours later, appellant drove the victim to a spot near her residence, from which she ran home.

Immediately upon reaching her home, the young lady telephoned an artist friend, who promptly came to her apartment; and following her direction, he penned a pictorial representation of the assailant. It being the daylight hours of February 13, the victim reported the incident to the police and sought medical attention.

Over defense objection at trial, the pictorial representation was admitted into evidence. The victim testified that

1. Violation of the "Crimes Code", Act of 1972, Dec. 6, P.L. 1482, No. 334, §§ 3121 and 2702, respectively.

both she and her friend participated in its preparation, but that only the friend, one Alan Beaverson, did the drawing. There was ample lighting in the parking area where she was forced to spend the two hours with appellant, which lighting afforded her a clear view of him, and enabled her at trial to be unequivocal in identifying the attacker. Furthermore she testified that the sketch was accurate and that it "entered into my judgment" insofar as identification was concerned. Artist Beaverson, who had before drawn pictures for the police, testified at trial and supported the accuracy of the victim's statements. Before us, appellant has reiterated objection to this picture, alleging that the use of the picture was not proper for probative value and unduly prejudiced the jury against appellant.

Curiously, while the use of artist's sketches of alleged perpetrators of crime has become a common police investigative tool, we find that the situation which this case presents as to trial use of the sketch has been before our appellate courts infrequently. In *Commonwealth v. Rothlisberger et al.,* 197 Pa.Super. 451, 453, 178 A.2d 853, 854 (1962), a rape case in which the prosecutrix had caused a third party to sketch her descriptions of her assailants, which sketches were made available to the jury, we found this method of description by pictorial representation "to be similar to where a witness orally describes someone she wishes later to identify and records her description—whether by tape recorder, written memorandum, by the memory of someone else hearing it, or as in this case, by an artist's sketch." Such descriptions, when testified to by the third party to whom they were given, are hearsay, but "have been accepted as part of the *res gestae when made at, or shortly after, the time of the event.*" (Emphasis ours; *Rothlisberger, id.,* 197 Pa.Super. at 453, 178 A.2d at 854). As in *Rothlisberger,* the question in the instant case becomes one of determining whether the sketch is evidence falling within the "res gestae" exception to the hearsay rule.[2]

2. Our Court, in *Rothlisberger,* through Montgomery, J., Wright and Woodside, JJ., dissenting, Rhodes, P. J., absent, found the requirements of the res gestae exception not to have been met because the

 It is an axiom of our jurisprudence that a third person may not testify as to a statement made to such person by another, when the probative value of the evidence sought arises from the latter's statement, because the veracity and competency of the original speaker are not subject to examination. One of the number of exceptions to this rule arises when the trial court can be confident that the original speaker has spoken to the third person spontaneously and out of the heat of the occurrence itself. See *Commonwealth v. Goetz,* 129 Pa.Super. 22, 195 A.2d 144 (1937). The spontaneity of the statement made by the one involved and the closeness of time to the event overcomes the fear that premeditation or outside forces have entered the mind of the victim to cloud or color his perception or knowledge. There is no definite time limit. *Commonwealth v. Noble,* 371 Pa. 138, 88 A.2d 760 (1952). So long as the facts admit of no confusing forces operating upon the recollection of the victim, a lapse of time of at least one to several hours from the time of the offense to the giving of the statement is allowed for "res gestae" purposes. *Commonwealth v. Nowalk,* 160 Pa.Super. 88, 50 A.2d 115 (1947) and *Commonwealth v. Dessus,* 214 Pa.Super. 347, 257 A.2d 867 (1969).

 In this case, the testimony of the victim is that immediately upon her return home, she telephoned Beaverson, and that he promptly arrived to begin and complete the sketch. He found her crying and upset. This entire session with the artist occurred not longer than 2½ to 3 hours after the attack. It was the victim's testimony that she reported to the police *after* completing the sketch, and not later than 2½ to 3 hours following the rape. Likewise Beaverson testified that he received her call about six o'clock, that he immediately went to her apartment to do the sketch, and that after it was done, they reported the rape to the police— at 7:30 or eight o'clock, approximately three hours after the assault. Testimony as to the elapsed time is not impugned, and the victim testified to having done nothing between the

prosecutrix waited four days to describe her attackers. Also, the artist did not testify.

time she returned home and the time the sketch was drawn which might lead us to suspect that her statements of description of the appellant to Beaverson might be tainted by a lack of accuracy, specificity and spontaneity. We find that the victim's and Beaverson's evidence by way of the pictorial representation of appellant, bolstered by their oral testimony at trial, fulfills the requirements of the "res gestae" exception to what would otherwise be hearsay. The sketch was properly admitted.

■ Secondly appellant challenges as error the evidence of the results of hospital emergency tests upon the person of the victim, which were given at 9:35 a. m., on February 13. Examining physician Grossi testified to having performed an internal examination of the victim, during which he found a small amount of grayish secretion in the vagina. This was analyzed by laboratory chemist (Ph.D.) Elser, whose medical opinion was that the fluid or enzyme examined was male seminal fluid. This conclusion was based upon a test for the presence of acid phosphatase, which was found in a concentration which equated that normally present in seminal fluid. The presence of acid phosphatase means that sexual intercourse has occurred within 24 to 48 hours. While the test was not the kind which would find evidence of sperm, it was the conclusion of physician and chemist that the seminal fluid, made of its component acid phosphatase, was found in the victim's vagina and that the only way it could have gotten there was by a male's ejaculation. The results of a test of this nature is a circumstance corroborating the testimony of the victim that intercourse had transpired. In response to an objection by the appellant that the test was not accurate, the lower court heard the methods used for testing, the qualifications of the tester, and the tester's conclusions as to the instant test. Being satisfied with the nature of the test and the manner in which it was conducted the trial court accepted into evidence the testimony of the results of the test. Both doctors involved in the test qualified as experts in their subjects, and provided extensive testimony, both direct and on cross-examination. We find

no reason to disturb the discretion of the lower court in its having allowed into evidence the test results.

Judgment of sentence affirmed.

SPAETH, J., files a concurring opinion, in which HOFFMAN, J., joins in Part I of this opinion.

CERCONE, J., concurs in the result.

HOFFMAN, J., concurs in the result reached by the Majority because the appellant failed to object to the admission of the drawing as inadmissible hearsay.

SPAETH, Judge, concurring:

I reach the same result as the majority, but I cannot join its opinion, for two reasons.

–1–

Appellant does not argue that the drawing was inadmissible hearsay. To the contrary, he concedes that "[o]bjection was not made to its use by victim in identifying [appellant] . . .." Appellant's Brief at 3. Accordingly, we should not discuss whether the drawing was inadmissible hearsay. As a general rule we should only respond to issues raised by the parties.

Appellant does argue about the drawing; he raises two issues: that the drawing "serve[d] no legitimate purpose except to prejudice the jury"; and that the drawing "was not relevant." Appellant's Brief at 3. The majority does not respond to these issues—not that I much blame it, for the issues are close to trivial, given appellant's concession that it was proper for the victim to use the drawing. An exhibit should be excluded as prejudicial if for some reason, its gruesomeness for example, it will result in the jury being unable to appraise the evidence in a level-headed manner. *See generally* McCormick, Evidence § 185 (Cleary ed. 1974). Appellant offers no reason to suppose that the drawing here had that result. As for relevance, the central issue was identification; the drawing was relevant to that whether or not it depicted someone who resembled appellant.

–2–

If for some reason it were appropriate to discuss whether the drawing was inadmissible hearsay, I should not say, as the majority does, that it "fulfills the requirements of the 'res gestae' exception . . . ." Majority opinion at 382.

We ought to stop saying that there is a " 'res gestae' exception." *See* Morgan, *A Suggested Clarification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, ⸺ (1922) ("a Latin phrase to serve as a substitute for reasoning"); McCormick, *supra,* § 228 ("The ancient phrase can well be jettisoned . . . ."); 6 Wigmore, Evidence § 1767 (Chadbourn ed. 1976) ("The phrase has nothing to entitle itself . . . to preservation."); Moylan, *Res Gestae, Or Why Is That Event Speaking and What Is It Doing in This Courtroom?* 63 A.B.A.J. 968 (July 1977). As these commentators note, the phrase " 'res gestae' exception" has been used in two situations: first, to justify the admission of a spontaneous declaration that is not hearsay at all, because it is not offered for its truth but for the mere fact of its utterance; and second, to justify the admission of statements that come within one of four distinct exceptions to the general rule against hearsay evidence, namely, declarations of present bodily condition, declarations of present mental state, excited utterances, and unexcited declarations of present sense impressions. McCormick, *supra* §§ 288–298. The danger in using the phrase " 'res gestae' exception" is that the court's analysis of a given evidentiary problem, and consequently, the scope of its holding, will be rendered obscure. The present case illustrates this danger, for one cannot tell from the majority's opinion how it regards the drawing; the label "spontaneous" does not even tell one whether the drawing is or is not hearsay, much less explain why it was properly admitted.

My own analysis might go somewhat as follows (I say "might" because, since the point was not argued to us, I regard what I am about to say as *dictum,* offered only by way of responding to the majority's *dictum* ).

First, the drawing should be defined as hearsay. Suppose a victim says to his friend, "I was attacked by a man with a mustache." If the friend testifies in court to this statement, the testimony is hearsay, for it is a statement made out of court, being offered for the truth (that the man did have a mustache). Now suppose the friend draws a picture of the mustache, and then, in response to instructions from the victim, alters it until the victim says, "That's what his mustache looked like." The drawing then becomes the victim's statement; the mere fact that the statement is in picture form instead of in words does not alter its character as a statement, made out of court, and being offered for the truth.

Second, since the drawing is hearsay, the question arises whether it fits within one of the recognized hearsay exceptions. In my judgment, it does not.

The drawing was not a declaration of present bodily condition, as for example where the declarant complained of blackouts, or a tight feeling in the chest, or dizziness. McCormick, *supra* § 291.

Neither was the drawing a declaration of present mental state. At least, it was not within the cases usually involving this exception. Typically, these cases involve a declaration of an emotion, or of an intention. Among the examples cited by McCormick are these: "I don't like being away from my wife", admissible to prove intent that absence be temporary; "I am trying to see what is the matter with the gas", admissible to prove motive of person seen tampering with meter; "I expect to leave Wichita with Mr. Hillman", admissible to show intent to leave. McCormick, *supra* §§ 294-295.

Neither was the drawing an excited utterance. To the contrary, it was elicited by the artist, who drew a partial impression, and then altered it, step by step, as instructed by the declarant over a period of time. The excited utterance exception has two basic requirements: "an occurrence or event sufficiently startling to render normal reflective

thought processes of an observer inoperative", and "the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought." McCormick, *supra* § 297.

Finally, neither was the drawing an unexcited declaration of a present sense impression. This exception requires that the declarant must see the event, must make an observation about the event to another person also present at the scene, and that the observation must be made at the time of the event, or so shortly afterwards that it is unlikely that the declarant had the opportunity to form the purpose of mis-stating his observation. McCormick, *supra* § 298.

None of this is to suggest that the drawing was not properly admitted. The rule against hearsay evidence should not be narrowly defined, and rigidly enforced. It has repeatedly been changed, in response to experience with its application and analysis by scholars, and it should always be interpreted in light of the dangers it is intended to guard against. Here, if the victim were unavailable, I should have considerable difficulty in deciding whether the artist alone should be allowed to testify to his drawing. With the victim available, however, and present to testify about what she told the artist, and how accurately the drawing depicted her attacker, it seems to me that the drawing was properly admitted. The principal reason for excluding hearsay is the danger that the declarant's credibility cannot be assessed. That danger was not present here, for defense counsel had the opportunity to cross-examine the declarant, and the trier of fact the opportunity to observe her reaction to the exami-nation. Given these circumstances, I believe the drawing was properly admitted. *See* McCormick, *supra* § 251, espe-cially at p. 603.

I concur in the majority's order affirming the judgment of sentence.

HOFFMAN, J., joins in Part I of this opinion.