410 A.2d 336

**COMMONWEALTH of Pennsylvania**

v.

**Floyd SUMMERS, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Guy LAWRENCE, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 8, 1978.

Filed Sept. 14, 1979.

John W. Packel, Assistant Public Defender, Chief, Appeals Division, Philadelphia, for appellant Summers, at No. 190.

H. David Spirt, Norristown, for appellant Lawrence, at No. 248.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before VAN der VOORT, WIEAND and LIPEZ, JJ.

VAN der VOORT, Judge:

These are two appeals in criminal charges against two defendants, tried together in the lower court, and consolidated in our court for argument and disposition.

Both appellants were found guilty by a jury of aggravated assault and possession of an instrument of crime, and acquitted of robbery and conspiracy.

The evidence adduced at the trial indicated that both defendants and a third man made an aborted effort to rob a billiard parlor operated by one James Cleveland. The three fled into the street pursued by Cleveland carrying an unloaded shot gun. Cleveland's son, James Williams, joined the pursuit, and a bullet hit his eye, causing a total loss of the eye.

Williams did not see who shot him. Cleveland testified that defendant Summers (nickname "Baker") shot Williams.

Summers denied that he shot Williams, or even had a weapon in his possession (N.T. 1089). Lawrence (nickname "Moose") denied that he had a gun in his possession on the night in question, or that he had shot Williams (N.T. 803, 804); he admitted he had seen Summers in the general area earlier in the evening, but not in the immediate area where the shooting occurred (N.T. 845).

Williams and Cleveland were the first two prosecution witnesses. The third was an Officer William McQuillan. He testified that he received a radio call at approximately 2:20 A.M. on September 15, 1976, and went to the corner of 16th and Fontain.

When he arrived, the officer testified that he saw (N.T. 630) "a Negro male . . . with his hand over his eye crying with blood pouring out of his eye . . ."; that a Pearl Dickins was present, to whom he spoke (N.T. 634) and who "stated to me that Baker shot her brother."

This evidence was received after a side-bar offer, against the objection of the attorney for Summers (N.T. 631–633). In the colloquy it was developed that Pearl Dickins was the sister of Williams and daughter of Cleveland. The prosecuting attorney said that she was "an eyewitness to the shooting" (N.T. 632). There was no evidence to support this statement; that she would not be called as a prosecution witness, but was "available" (N.T. 633).

The court permitted the officer's testimony to be received in evidence. During the trial, Judge Guarino made this comment: (N.T. 633):

THE COURT: I rule, one, even if it is not a res gestae statement, that it is an exception to the hearsay rule because it goes to the identity of the perpetrator and I rule that Pennsylvania law is not to the effect that she has to testify or she even has to be available, but afforce, if she is, that makes it even stronger, so I would rule that it is admissible.

Both defendants claim that the admission of this hearsay testimony constituted reversible error. The Common-

wealth's Brief argues that the testimony was admissible as "res gestae", and that in any event the admission of the testimony was "harmless error" (Brief, page 8).

In his opinion, filed after the appeals, Judge Guarino stated (page 15):

(c) I overruled defendants' objection to Officer McQuillan's testimony that one Pearl Dickins said to him that 'Baker shot her brother'. While this was on out-of-court declaration of another, it had all the earmarks of being an integral part of the criminal incident itself. A spontaneous utterance stimulated by the excitement of a stressful event, and made before the reflective powers of the declarant are free of the emotional stress caused by the event, are admissible into evidence. *Commonwealth v. Edwards*, 431 Pa. 44, 244 A.2d 683 (1966); *Commonwealth v. Noble*, 371 Pa. 138, 88 A.2d 760 (1952).

Ms. Dickins' spontaneous statement to the police on their arrival on the criminal scenario was just as much a circumstance of that incident as her bleeding brother. The fact that the evidence was verbal and that police heard it rather than saw it does not make it hearsay. But if hearsay, it was nonetheless admissible by way of the res gestae exception. *Commonwealth v. Edwards*, supra; *Commonwealth v. Noble*, supra.

We do not believe that either the *Noble* case supra, or *Edwards* supports the court's ruling.

In *Edwards* the declarant was the victim of a shot in the buttocks and made his initial declaration at the scene of the crime while suffering from the attack upon him.

In *Noble* the admission of the declaration of the victim's wife made perhaps a half hour after discovery of the crime was held reversible error. Among other things the Supreme Court says in that case that "[t]he res gestae rule . . . is a dangerous rule . . . and . . . ought not to be extended beyond the limits of reasonably immediate, spontaneous declarations relating to the controverted fact." 371 Pa. 138, 144–45, 88 A.2d 760, 763.

■ We agree with the arguments of defendants that, at a minimum, there must be evidence that the declarant had personal knowledge of her utterance, and that the utterance was the spontaneous product of shock or injury. *Carney v. Pennsylvania Railroad Co.*, 428 Pa. 489, 493, 494, 240 A.2d 71, 73, 74 (1968). See also *Commonwealth v. Pronkoskie*, 477 Pa. 132, 383 A.2d 858 (1978); *Williams v. Philadelphia Transportation Co.*, 244 Pa.Super. 492, 368 A.2d 1292 (1976).

■ In our present case the declaration of Pearl Dickins seems clearly inadmissible as an exception to the general hearsay rule, because there was no evidence (1) that she witnessed the shooting, or (2) that she was in any great shock or emotional state when Officer McQuillan talked with her.

The lower court seemed of the opinion that testimony as to Dickins' availability as a witness (presumably to either side, although the Commonwealth had stated it would not call her) served to make the declaration admissible (N.T. 632). We think this circumstance makes the ruling that the declaration was admissible even more clearly in error: defendants had no opportunity to examine the declarant as to all the circumstances affecting the competency and weight of the substance of her declaration, unless defendants elected to call this presumably hostile witness as their own witness—an alternative to which, in all fairness, defendants should not be subjected.

The Commonwealth argues that, if there was error in the admission of this testimony, the error was "harmless". We cannot agree, particularly since only Cleveland testified that Summers ("Baker") fired the shot which injured Williams, and Cleveland's testimony was subjected to considerable attack.

There might be some possible question as to whether the testimony was harmful as to Lawrence, since it tended to inculpate directly only the other defendant Summers. It is obvious, however, from the record that the Commonwealth's theory of the case was that at all times both defendants were acting as conspirators and accomplices of each other.

As a matter of fact, we found no evidence that Lawrence individually assaulted Williams, but the jury found him guilty of such an assault. Therefore, we cannot say that the admission of the declarant testimony was not harmful as to Lawrence.

Because of the erroneous admission of hearsay testimony, the judgments must be reversed and new trials granted.

Three other questions raised in these appeals are:

1. Defendant Summers testified in his own behalf. He testified on direct examination that he had never been convicted of crime (N.T. 1100) although he had been arrested "a couple times" for possession of marijuana, and that "prior to this occasion" his reputation "in the community for being peaceful and law abiding citizen" was "very respectful" (N.T. 1101), but his reputation was damaged because of the arrest in this case on September 15, 1976.

On cross-examination, he was asked, over objection, whether he was arrested on October 4, 1976 and charged with "terroristic threats on October the 4th", and "tampering with a witness", Pearl Dickins, on the same day. On re-direct, the court refused to receive defendant's testimony that the charges against him had been dismissed.

■ Defendant Summers argues that his testimony as to reputation was carefully limited to on and prior to September 15, 1976, the day of his arrest on the present charges, and that the court should have excluded evidence of the arrest on October 4th, roughly three weeks later. We agree with the lower court that Summers had put his reputation at issue with himself essentially a character witness in his own behalf, and that in those circumstances it was not error to permit testimony as to defendant's arrest on October 4th. *Commonwealth v. Williams*, 227 Pa.Super. 103, 112, 323 A.2d 135, 139, 140 (1974). In the special circumstances of this present case, however, where the evidence adduced by the Commonwealth established that the charge of tampering involved Pearl Dickins, we believe that defendant should have been permitted to show that the charges against him involving the October 4th arrest were dismissed.

2. Defendants complain that they were improperly restricted in their cross-examination of James Cleveland.

This complaint breaks down into three categories:

a. Defendants were not permitted to impeach Cleveland's credibility by showing that he had been convicted of larceny and robbery in 1945, of larceny and impersonating an officer in 1946, and of burglary in 1952.

■ The court held that these records of convictions were too remote to be used. We believe this holding was within the judicial discretion of the trial judge. *Commonwealth v. Bighum*, 452 Pa. 554, 567, 307 A.2d 255, 263 (1973); *McIntosh v. Pittsburgh Railways Co.*, 432 Pa. 123, 125, 247 A.2d 467, 468 (1958).

b. Defendants were prevented from showing inconsistencies between Cleveland's testimony in court and other statements or testimony by him.

Counsel for defendants have complained in their briefs, generally about the restrictions imposed by the court on their cross-examination of Cleveland without citing any specific instances which they believe constitute reversible error.

■ We agree with the general principles stated in the brief for Summers that cross-examination of witnesses is the principal means by which the believability of a witness and the truth of his testimony are tested, and that the examiner should be permitted to "delve into the witness' perceptions and memory", and to impeach, that is discredit, the witness by showing prior inconsistent statements or by other means, subject, always, to reasonable restriction by the court within its judicial discretion. *Commonwealth v. Marker*, 231 Pa.Super. 471, 476, 331 A.2d 883, 886 (1974).

■ c. Evidence of defendant Lawrence tending to show that Cleveland was intoxicated that evening was improperly stricken.

Lawrence testified that he had been in Cleveland's barroom that night, saw him drink two quarts of Colt 45 Malt Liquor, that he was "sitting there kind of drab", that he concluded Cleveland was intoxicated from "just the way he

looked at me" and "the way he was walking", "it just appears to me he was high." (N.T. 913–914). The Court sua sponte struck the evidence from the record.

Judge Guarino stated in his opinion (page 16) that he ruled out the witness's testimony because the witness failed to state the facts which he observed which led the witness to conclude Cleveland was intoxicated, citing *Laubach v. Colley*, 283 Pa. 366, 129 A.2d 88 (1925) and *Gensemer v. Williams*, 419 F.2d 1361 (CA3 1970). For whatever weight the testimony might have, we believe there was a sufficient factual basis for the witness's conclusion to make the conclusion admissible. *Commonwealth v. Horn*, 395 Pa. 585, 590, 150 A.2d 872, 874–875 (1959).

3. Defendants complain that the probation ordered for each of them, conditioned upon confessing paternity in the Family Court and paying child support payments, was illegal.

Since the cases must be retried we do not now comment on this issue.

Judgments reversed and new trials granted.